## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NYC C.L.A.S.H., INC.,<br>    2052 Hendrickson St.<br>    Brooklyn, NY 11234 | ) |
| | ) |
| WILLIAM DONNELL,<br>    118 Haller St., Apt. 29<br>    Wood River, IL 62095 | ) |
| | ) |
| NATHAN FIELDS,<br>    701 5th St, Apt. 4<br>    Albuquerque, NM 87102 | ) |
| | ) |
| CHANEL FOLKS,<br>    2352 Batchelder St., Apt. 4D.<br>    Brooklyn, NY 11229 | ) |
| | ) Civil Action No. 1:18-cv-1711 |
| DIGNA RODRIGUEZ,<br>    420 W. 19 St., Apt. 4E<br>    New York, NY 10011 | ) |
| | ) |
| DOUGLAS SONCKSEN,<br>    66 Honeysuckle Lane<br>    Oak Ridge, TN 37830 | ) |
| | ) |
|     and | ) |
| | ) |
| JAMIE WARD,<br>    1111 Jay St., Apt. 309<br>    Ogdensburg, NY 13669 | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | ) |
| | ) |
| BEN CARSON, Secretary of Housing and Urban<br>Development, *in his official capacity*,<br>    451 7th Street S.W.<br>    Washington, DC 20410, | ) |
| | ) |
|     and | ) |
| | ) |
| U.S. DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT,<br>    451 7th Street S.W.<br>    Washington, DC 20410, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.  Introduction

1.      This action, brought pursuant to the relevant provisions of the Administrative Procedure Act, 5 U.S.C. §§701 – 706 (the "APA"), the Fourth Amendment (U.S. Const. Am. IV), the Fifth Amendment (U.S. Const. Am. V), the Tenth Amendment (U.S. Const. Am. IV), and the Fourteenth Amendment (U.S. Const. Am. XIV), seeks to vacate or in the alternative modify the U.S. Department of Housing and Urban Development's ("HUD") rule "Instituting Smoke-Free Public Housing, effective February 3, 2017, codified at 24 CFR Parts 965 and 966 (the "Smoking Ban" or the "Ban").

2.      Pursuant to the Smoking Ban, not later than 18 months from the effective date of the Ban, each public housing agency ("PHA") administering public housing1 must implement and enforce a ban on the use of prohibited tobacco products in all public housing living units, indoor common areas in public housing, and in PHA administrative office buildings.  This ban requirement also extends to all outdoor areas up to 25 feet from the public housing and administrative office buildings.

3.      Plaintiff NYC C.L.A.S.H., INC. ("CLASH"), together with the individual Plaintiffs, all of whom are tenants of public housing and smokers, seek judicial review of the Smoking Ban pursuant to 5 U.S.C. § 702, and a judicial determination vacating or in the alternative modifying the Smoking Ban pursuant to 5 U.S.C. § 706.

4.      As set forth below, the Smoking Ban violates the "anticommandeering doctrine," violates the constitutional rights of a number of CLASH's members, and the constitutional rights

---

1 24 CFR §965.651defines "public housing" for purposes of the Smoking Ban as "low-income housing, and all necessary appurtenances (*e.g.* community facilities, public housing offices, day care centers, and laundry rooms) thereto assisted under the U.S. Housing Act of 1937 . . . other than assistance under section 8 of the 1937 Act."

2

of the Individual Plaintiffs and all other tenants of public housing similarly situated; in addition,

the Ban exceeds the authority granted to HUD by Congress; and furthermore, the Ban is arbitrary,

capricious, and an abuse of HUD's discretion.

## II. Parties

5.        Plaintiff CLASH (NYC C.L.A.S.H. is an acronym for "New York City Citizens

Lobbying Against Smoker Harassment") is a New York entity operating since 2002 as a non-

profit smokers' rights organization dedicated to protecting the interests of adults who choose to

smoke.   CLASH has over 2,000 members, over 90% of whom are smokers, and some of whom

reside in public housing.

6.        Plaintiff William Donnell ("Donnell") is forty-two years of age, is of combined

Irish and Native American ancestry, is a smoker, and is an eight-year tenant of the Stevens

Building in Wood River, Illinois, a two-story, 46-unit series of attached apartments which are

controlled and operated by the Madison County Housing Authority, a PHA which is required to

comply with the Smoking Ban. Donnell suffers from multiple physical disabilities and barely

survives solely on Social Security disability benefits, leaving him with no reasonable residence

alternative to public housing.

7.        Plaintiff Nathan Fields ("Fields") is fifty-six years of age, is African-American, is

a smoker and is a tenant of the 701 5th Street complex in Albuquerque, New Mexico, a 156-unit

housing apartment community which is controlled and operated by the Albuquerque Housing

Authority, a PHA required to comply with the Smoking Ban.  Fields, like Donnell, survives

solely on Social Security disability benefits, leaving him with no reasonable alternative to public

housing.

8.      Plaintiff Chanel Folks ("Folks") is forty years of age, is African-American, is a smoker and is a tenant of the Sheepshead Nostrand Houses in Brooklyn, New York, a series of high-rise apartment buildings which are controlled and operated by the New York City Housing Authority (the "NYCHA"), a PHA required to comply with the Smoking Ban.

9.      Plaintiff Digna Rodriguez ("Rodriguez") is sixty-four years of age, is Hispanic, is a smoker, and is a tenant of the Robert Fulton houses in New York, New York, a series of high-rise apartment buildings which are managed and operated by the NYCHA.

10.     Plaintiff Douglas Soncksen ("Soncksen") is fifty-four years of age, is Caucasian, is a smoker and is a tenant of the Honeysuckle Lane apartments in Oak Ridge, Tennessee, a 28-unit series of ground-level apartments under the control and operation of the Oak Ridge Housing Authority, a PHA required to comply with the Smoking Ban.

11.     Plaintiff Jamie Ward ("Ward") is forty years of age, is Caucasian, is a smoker and is a tenant of an apartment in Ogdensburg, New York, under the control and operation of the Ogdensburg Housing Authority, a PHA required to comply with the Smoking Ban.

12.     Each of the Individual Plaintiffs, together with some of CLASH's individual members who reside in public housing and thousands of other similarly situated individuals, have suffered and will suffer concrete injuries as a result of the Smoking Ban, to wit: they are now prohibited from exercising their right to engage in a legal activity (smoking) in the privacy of their own homes, under threat of eviction.

13.     Defendant, Ben Carson ("Carson"), sued in his official capacity, is the current Secretary of Housing and Urban Development.

14.     Defendant, HUD, is a federal agency established in 1965 by the Department of

Housing and Urban Development Act (the "HUD Act").  HUD is responsible for administration of national housing policy and programs and enforcement of fair housing laws.  As part of this mandate, HUD provides subsidies to PHAs nationwide pursuant to the Housing Act of 1937 and other applicable authority, and conditions receipt of these subsidies on compliance with HUD's regulations, rules, and policies.

### III.  Jurisdiction & Venue

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 5 U.S.C. § 703 because the claims arose in the District, Defendants reside in this District, and a substantial part of the events giving rise to this action occurred in the District.   Additionally, pursuant to 28 U.S.C. §1391(e)(1)(A), venue is proper in the District of Columbia because all Defendants maintain offices within the District of Columbia.

### IV.  Plaintiffs' Statutory Right to Judicial Review Under the APA

17.     5 U.S.C. § 702 – Right of Review, provides, in pertinent part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

18.     5 U.S.C. § 704 – Actions reviewable, provides, in pertinent part:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

19.     5 U.S.C. § 706 – Scope of review, provides, in pertinent part:

To the extent necessary to a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–

**(2)** hold unlawful and set aside **agency action,** findings, and conclusions found to be—
**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
**(B)** contrary to constitutional right, power, privilege, or immunity;
**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

20.     In this action, the Plaintiffs have suffered a legal wrong because of HUD's adoption of the Smoking Ban, the Ban is final, and there is no other adequate remedy. Additionally, HUD, in adopting the Ban, abused its discretion, acted contrary to any rights, powers or privileges it may have, and acted in excess of its statutory and constitutional authority. Therefore, judicial review of the Ban is appropriate under the APA.

### V.  Historical Background of HUD & Scope of the HUD's Rulemaking Authority

21.     In 1934, Congress passed the National Housing Act (a/k/a Capehart Act), which created the Federal Housing Administration ("FHAD") to insure mortgages and to regulate the rates of interest and terms of the mortgages.

22.     Three years later, Congress passed the Housing Act of 1937 (a/k/a Wagner-Steagall Act), which created the United States Housing Authority ("USHA") to aid in the construction of low-rent housing.

23.     In 1942, President Franklin Roosevelt signed Executive Order 9070, establishing the National Housing Agency ("NHA").  NHA consolidated FHAD and USHA, together with other housing and mortgage-related agencies, under one umbrella.

24.     In 1947, the Housing and Home Finance Agency ("HHFA") was established through Reorganizational Plan No. 3, a directive submitted by President Truman to

Congress in accordance with the Reorganization Act of 1945.  HHFA, which replaced the

NHA, was responsible for administration of federal housing programs from 1947-1965.

25.     HHFA consisted of FHAD, the Public Housing Administration ("PHAD"), and the

Home Loan Bank Board, the last of which separated from HHFA in 1955.

26.     On May 27, 1947, President Truman delivered a "Special Message to Congress

Transmitting Reorganization Plan 3 of 1947."  He identified the "provision of adequate housing"

as "a major national objective . . . "  and noted the importance of  "grouping . . . housing

functions in one establishment . . . ".  As identified by President Truman, the functions, powers

and duties of HHFA were to include "facilitat[ion] of home construction and home ownership,"

establishing a credit reserve system for home financing institutions, maintaining "a system for the

insurance of home loans and mortgages to stimulate the flow of capital into home mortgage

lending . . .", and "provision of decent housing for families of low income . . .".  Today, these

and related duties and functions are the duties and functions of HHFA's direct descendant, HUD.

27.     HUD was established on September 9, 1965 when President Lyndon B. Johnson

signed the HUD Act into law.

28.     Pursuant to HUD's organic (enabling statute), 42 U.S.C. Chapter 44 (Department

of Housing and Urban Development, 42. U.S.C. §§ 3531 – 3549), which establishes the agency,

its functions, and its responsibilities, "all of the functions, powers, and duties of the [HHFA], of

the [FHAD] and of the [PHAD]" were "transferred to and vested in" the Secretary of HUD.  (42

U.S.C. § 3534).

29.     HUD, like other federal agencies, derives its authority to regulate and to

promulgate rules from Congress.

30.     As with other federal agencies, HUD's authority to promulgate rules derives either

7

from a specific law or from the agency's organic statute,

31.     HUD's rulemaking authority is found in Section 7(d) of the HUD Act, 42 U.S.C. §

3535, which is part of HUD's organic statute.  Section 7(d) provides as follows:

> (d) DELEGATION OF AUTHORITY; RULES AND REGULATIONS
> The Secretary may delegate any of his functions, powers, and duties to such officers and
> employees of the Department as he may designate, may authorize such successive
> redelegations of such functions, powers, and duties as he may deem desirable, and may
> make such rules and regulations as may be necessary to carry out his functions, powers,
> and duties.

32.     Pursuant to 42 U.S.C. § 3534, the "functions, powers, and duties" of the Secretary

of HUD as set forth in 42 U.S.C. § 3535 are substantially the same as the functions, powers, and

duties that were vested in HHFA.

33.     As set forth hereinafter, the functions, powers, and duties of the Secretary of HUD

do not authorize the Agency to promulgate the Smoking Ban.

## VI.  HUD Promulgates The Smoking Ban

34.     On November 17, 2015, during a prior presidential administration, HUD published

the proposed Smoking Ban in the Federal Register Vol. 80, No. 221 (80 FR 71762 – 71769),

entitled "Instituting Smoke-Free Public Housing."  The Proposed Rule Summary in the November

17, 2015 Federal Register stated:

> **SUMMARY**: This proposed rule would require each public housing agency (PHA)
> administering public housing to implement a smoke-free policy. Specifically, this rule
> proposes that no later than 18 months from the effective date of the final rule, each PHA
> must implement a policy prohibiting lit tobacco products in all living units, indoor
> common areas in public housing, and in PHA administrative office buildings (in brief, a
> smoke-free policy for all public housing indoor areas). The smoke-free policy must also
> extend to all outdoor areas up to 25 feet from the housing and administrative office
> buildings. HUD proposes implementation of smoke-free public housing to improve indoor
> air quality in the housing, benefit the health of public housing tenants and PHA staff,
> reduce the risk of catastrophic fires, and lower overall maintenance costs.

35.     On December 5, 2016, HUD published the final Smoking Ban in the Federal

Register Vol. 81, No. 233 (81 FR 87430 - 87444), with an effective date of February 3, 2017.

The Rule Summary in the December 5, 2016 Federal Register was substantially similar to the

Proposed Rule Summary in the November 17, 2015 Register:

> **SUMMARY**:  This rule requires each public housing agency (PHA) administering
> public housing to implement a smoke-free policy. Specifically, no later than 18
> months from the effective date of the rule, each PHA must implement a ''smoke-free''
> policy banning the use of prohibited tobacco products in all public housing living units,
> indoor common areas in public housing, and in PHA administrative office buildings.
> The smoke-free policy must also extend to all outdoor areas up to 25 feet from the public
> housing and administrative office buildings. This rule improves indoor air quality in the
> housing; benefits the health of public housing tenants, visitors, and PHA staff; reduces the
> risk of catastrophic fires; and lowers overall maintenance costs.

36.     The Smoking Ban was codified at 24 CFR Parts 965 and 966 under "Subpart

G – Smoke-Free Public Housing."

37.     The core of the Smoking Ban is codified at 24 CFR § 965.653, entitled

"Smoke-free public housing," which prohibits the use of all tobacco products in virtually all areas

of public housing:

### § 965.653   Smoke-free public housing.

(a) *In general*. PHAs must design and implement a policy prohibiting the use
of prohibited tobacco products in all public housing living units and interior
areas (including but not limited to hallways, rental and administrative offices,
community centers, day care centers, laundry centers, and similar structures),
as well as in outdoor areas within 25 feet from public housing and administrative
office buildings (collectively,''restricted areas'') in which public housing is located.
(b) *Designated smoking areas*. PHAs may limit smoking to designated smoking areas
on the grounds of the public housing or administrative office buildings in order to
accommodate tenants who smoke. These areas must be outside of any restricted areas,
as defined in paragraph (a) of this section, and may include partially enclosed structures.
Alternatively, PHAs may choose to create additional smoke-free areas outside the
restricted areas or to make their entire grounds smoke-free.
(c) *Prohibited tobacco products*. A PHA's smoke-free policy must, at a minimum, ban the
use of all prohibited tobacco products. Prohibited tobacco products are defined as:
(1) Items that involve the ignition and burning of tobacco leaves, such as (but not limited

to) cigarettes, cigars, and pipes.
(2) To the extent not covered by paragraph (c)(1) of this section, waterpipes
(hookahs).

38.     The manner and timing of implementation of the Smoking Ban is codified at

24 CFR § 965.655, entitled "Implementation," which provides:

> (a) *Amendments*. PHAs are required to implement the requirements of this
> subpart by amending each of the following:
> (1) All applicable PHA plans, according to the provisions in 24 CFR part
> 903.
> (2) Tenant leases, according to the provisions of 24 CFR § 966.4.
> (b) *Deadline*. All PHAs must be in full compliance, with effective policy
> amendments, by July 30, 2018.

39.     In furtherance of the requirements of the Smoking Ban, 24 CFR § 966.4 (Lease

requirements) provides, in pertinent part:

> (e) *The PHA's obligations*. The lease shall set forth the PHA's obligations under the lease,
> which shall include the following . . . .:

> (12) (i) To assure that <u>no tenant, member of the tenant's household, or
> guest</u> engages in:
> (B) *Civil activity*. For any units covered by 24 CFR part 965, subpart G, any
> smoking of prohibited tobacco products in restricted areas, as defined by 24
> CFR 965.653(a), or in other outdoor areas that the PHA has designated as
> smoke-free.
> (ii) To assure that <u>no other person under the tenant's control</u> engages in:
> (B) *Civil activity*. For any units covered by 24 CFR part 965, subpart G, any
> smoking of prohibited tobacco products in restricted areas, as defined by 24
> CFR 965.653(a), or in other outdoor areas that the PHA has designated as
> smoke-free.

> (Italics in original, underline added).

40.     HUD touts several purported benefits of the Smoking Ban, claiming that it will

"improve indoor air quality in public housing; benefit the health of public housing tenants,

visitors, and PHA staff; reduce the risk of catastrophic fires; and lower overall maintenance

costs."  (81 FR 87431).  Even assuming, *arguendo*, that these benefits were to be realized, the

Smoking Ban, nonetheless, violates the Constitution and is otherwise defective in numerous respects.

41.    In response to the publication of the Proposed Rule on November 17, 2015, HUD received numerous public comments, including comments opposing the Smoking Ban.

42.    The most extensive comment was submitted by Audrey Silk ("Silk"), CLASH's founder, on behalf of CLASH and its members, objecting to the Smoking Ban.  Silk argued that HUD was exceeding its authority in adopting the Ban, that HUD was interfering with adults' right to engage in a legal activity in the privacy of the home, that the Ban would have a disparate impact on minorities and disabled persons, that the Ban does not effectuate any health benefits to tenants of public housing, and that the Ban is unenforceable.

## VII.    Plaintiffs Are at Risk of Imminent and Concrete Injury and Therefore Have Standing to Bring This Action

43.    CLASH has standing to maintain this action because it is a smokers' rights organization and has been dedicated to protecting the interests of adults who choose to smoke since 2002.  CLASH has over 2000 members, including tobacco users who reside in public housing.  On numerous occasions, Courts have found that CLASH had organizational standing to maintain actions challenging anti-smoking regulations.  CLASH has standing to sue in its own right and on behalf of its members.  See, *Warth v. Seldin*, 422 U.S. 490 (1975).

44.    Each of the Individual Plaintiffs have standing to maintain this action because they are tenants of public housing subject to the Smoking Ban, they all use tobacco products, they will all face unreasonable invasions of their private spaces in connection with enforcement of the Ban, and they will all face eviction if they continue to use tobacco products once the Ban is implemented and enforced nationwide on July 30, 2018.  In fact, as set forth herein, some of the

Plaintiffs' PHAs have *already* implemented the Ban and have begun enforcement.  Therefore,

they are all at risk of imminent and concrete injury in the form of eviction.  This constitutes

"injury in fact."  See, *Lujan v. Defenders* of Wildlife, 504 U.S. 555 (1992).

45.     Indeed, in response to HUD's promulgation of the Smoking Ban, PHAs

nationwide, including the PHAs that operate and manage the public housing in which Plaintiffs

reside, are taking the steps necessary to implement and enforce the Ban in advance of the July 30,

2018 deadline.

46.     Among the steps necessary to implement and enforce the Smoking Ban, PHAs

nationwide have already informed Plaintiffs and all other tenants of public housing that they will

face eviction if they use tobacco products in the privacy of their homes.  Additionally, PHAs

nationwide have demanded that Plaintiffs and all other tenants of public housing sign revised

leases and/or lease addendums requiring them to refrain from using tobacco products under pain

of eviction.

47.     For example, in April 2018, Folks and Rodriguez received a "Lease Addendum"

dated April 6, 2018 from NYCHA, which was delivered to all tenants of NYCHA-managed

properties.  The Lease Addendum states, in pertinent part:

**Your lease will be amended as follows**:

12(dd):  To assure that, in compliance with the Landlord's Smoke-Free Policy, the Tenant, any member of the household, a guest, or another person under the Tenant's control, shall not smoke prohibited tobacco products in restricted areas, as described in the Landlord's Smoke-Free Policy.  Restricted areas include, but are not limited to, the Leased Premises, all interior areas of the Development or other developments of the Landlord, and areas within 25 feet of development buildings, or to the property boundary where that boundary is less than 25 feet from the property line of a development building.  Prohibited tobacco products include, but are not limited to, cigarettes, cigars, pipes, and hookahs (water pipes).

48.     The Lease Addendum received by Folks and Rodriguez was delivered by NYCHA

12

under cover letter also dated April 6, 2018, which provides in pertinent part:

> Dear Tenant(s);
>
> Here is an addendum to your lease.  It includes NYCHA's new smoke-free policy which is required by the U.S. Department of Housing and Urban Development (HUD).  The Smoking Bans go into effect July 30, 2018 . . . .
>
> **You must sign and return this lease addendum to NYCHA by July 16, 2018 . . . .**
>
> **According to HUD regulations, you must sign and return this lease addendum if you want to maintain your NYCHA residency.**
>
> (bold in original)

49.     Donnell, Fields, Soncksen, and Ward have all received similar notices and lease

addendums.

50.     Ward received a notice from the Ogdensburg Housing Authority which provides

as follows:

> **Smoke-Free Public Housing**
>
> HUD's Smoke-Free Housing policy will take effect on July 30, 2018, meaning you will no longer be allowed to smoke in your apartment or within 25 feet of any Public Housing building. Failure to comply with this policy may result in eviction. Each tenant was given a copy of this policy during re-certification. Please refer to that document if you have any questions.

51.     Soncksen, for his part, received a letter dated March 14, 2018 from Kari King,

Public Housing Manager for the Oak Ridge Housing Authority, which stated in pertinent part:

> Dear Mr. Soncksen:
>
> It has come to my attention, you were seen smoking on your back porch.  As of March 1, 2018, a smoke-free policy went into effect which prohibits smoking on porches or within 25 feet of the building.
>
> Since this is a new policy and the first time you were seen violating this policy, we are giving a Free Pass this time.  This pass is not considered one of the graduated steps for smoke-free policy violators.  Only one free pass will be given to any a [sic] household

13

before we begin with [sic] 1st violation.

I have enclosed a copy of the current Smoke-Free Policy, for your reference.

52.     The "Oak Ridge Housing Authority Smoke-Free Policy," as delivered to

Soncksen, provides in pertinent part:

> Effective March 1, 2018, the use of tobacco products by residents or guests is
> prohibited in all public housing living units and interior areas (including but not
> limited to hallways, porches, administrative offices, maintenance facilities,
> warehouses, and similar structures).  As well as in outdoor areas within 25 feet
> from public housing, community room, administrative and maintenance office
> buildings . . . .
>
> Residents and employees who smell tobacco smoke from inside housing authority
> property are to report this to the Public Housing Manager or to the Administrative
> Office as soon as possible . . . .
>
> Evidence of used tobacco products in the unit, other than trash receptacles, will
> result in a violation of the smoke free policy.
>
> Failure to abide by this Smoke-Free Policy is a lease violation based on civil
> behavior with the following consequences:
>
> 1st Violation will result in a verbal warning document in the resident file.
> 2nd Violation will result in a Written Lease Violation.
> 3rd Violation will result in a Final Written Lease Violation.
> 4th Violation in any 12 month period will result in a *30 day lease termination*.
>
> (Emphasis added).

53.     Additionally, the Smoking Ban serves as an influential government document that

causes PHAs to take action against public-housing tenants who smoke, including the Individual

Plaintiffs and CLASH's members, and the PHAs would not take those actions but for the

Smoking Ban and would cease taking those actions upon the rescission of the Smoking Ban.

54.     Pursuant to the First Amendment (U.S. Const. Am. I) and analogous provisions of

state law, not only the Individual Plaintiffs but also CLASH on behalf of its members would like

to petition the relevant PHAs both to void their anti-smoking policies and, failing that, to include

14

"grandfather clauses" for smoking tenants whose residence pre-dates the anti-smoking policies, and the Smoking Ban is an obstacle to the exercise of that right of petition because the Smoking Ban prevents the PHAs from considering such petitions. This also constitutes "injury in fact."

55.     Finally, by purporting to make law in the area of smoking and tobacco use without the delegated authority from Congress to make such laws, HUD deprives Plaintiffs of their liberty interest in the separation of powers under the Constitution, further adding to their injuries.

## VIII.  Legal Defects of the Smoking Ban

### A.     The Smoking Ban Violates the Dual Sovereignty Principle of the Tenth Amendment and Therefore Violates the Anticommandeering Doctrine

56.     The Tenth Amendment provides that all legislative power not conferred on Congress by the Constitution is reserved for the States:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.  (U.S. Const. Am. X).

57.     Thus, the Tenth Amendment articulates the principle of "dual sovereignty."  *Printz v. United States*, 521 U.S. 898, 918 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)).

58.     Consistent with the Tenth Amendment, "[a]bsent from the list of conferred powers is the power to issue direct orders to the governments of the States."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1467 (2014).  This is the so-called "anticommandeering doctrine," which emerged in *New York v. United States*, 505 U.S. 144 (1992), and *Printz*.

59.     In *New York*, the Supreme Court held that a federal law unconstitutionally ordered the State to regulate in accordance with federal standards, and in *Printz*, the Court found that

another federal statute unconstitutionally compelled state officers to enforce federal law.

60.     Under the anticommandeering doctrine, "Congress may not simply 'commandeer

the legislative process of the States by directly compelling them to enact and enforce a federal

regulatory program." *New York*, 505 U.S. at 161.  Put another way:

> The Federal Government may neither issue directives requiring the States to address
> particular problems, nor command the States' officers, or those of their political
> subdivisions, to administer or enforce a federal regulatory program. *Printz*, 521 U.S. at
> 935.

The basic principle is that the Federal Government cannot issue direct orders to state legislatures,

state agencies, or state officials.

61.     When the original States declared their independence, they claimed the powers

inherent in sovereignty: the authority "to do all . . .  Acts and Things which Independent States

may of right do." *Murphy*, quoting Declaration of Independence, ¶ 32.  The anticommandeering

doctrine adheres to this principle.

62.     Crucially, the anticommandeering doctrine applies to the Federal Government as a

whole, and thus applies to actions taken by federal agencies2 (such as HUD) as well as Congress.

This was confirmed in *Printz*:

> Federal commandeering of state governments is such a novel phenomenon that this
> Court's first experience with it did not occur until the 1970's, when the
> Environmental Protection Agency promulgated regulations requiring States to
> prescribe auto emissions testing, monitoring and retrofit programs, and to
> designate preferential bus and carpool lanes. The Courts of Appeals for the Fourth
> and Ninth Circuits invalidated the regulations on statutory grounds in order to
> avoid what they perceived to be grave constitutional issues . . . . and the District of
> Columbia Circuit invalidated the regulations on both constitutional and statutory

---

2 More recently, in *City of Philadelphia v. Sessions*, No. 17-3894 (E.D. Penn. June 6, 2018) the anticommandeering
rule was cited by U.S. District Judge Michael Baylson in support of his ruling striking down the Trump
Administration's anti-sanctuary city policy, whereby Attorney General Jeff Sessions had sought to withhold federal
funds from Philadelphia due to the city's immigration "sanctuary" policies.

grounds . . . . After we granted certiorari to review the statutory and constitutional validity of the regulations, the Government declined even to defend them, and instead rescinded some and conceded the invalidity of those that remained, leading us to vacate the opinions below and remand for consideration of mootness.

Although we had no occasion to pass upon the subject in *Brown,* later opinions of ours have made clear that *the Federal Government* may not compel the States to implement, by legislation *or executive* action, federal regulatory programs.

*Printz*, 521 U.S. at 925 (emphasis added and internal citations omitted)(commenting on *Brown v. EPA*, 521 F.2d 827, 838-842 (9th Cir. 1975) and *EPA v. Brown*, 431 U.S. 99 (1997)).

63.     In the case at bar, HUD, by adopting the Smoking Ban, has violated the

anticommandeering doctrine because the Smoking Ban is a federal policy and HUD is requiring

PHAs to implement and enforce this federal policy.  This is evidenced by the plain language of

the Smoking Ban as set forth in the December 5, 2016 Federal Register:

This rule ***requires*** each public housing agency (PHA) administering public housing to ***implement*** a smoke-free policy. Specifically, no later than 18 months from the effective date of the rule, each PHA ***must implement*** a ''smoke-free'' policy banning the use of prohibited tobacco products in all public housing living units, indoor common areas in public housing, and in PHA administrative office buildings. The smoke-free policy ***must*** also extend to all outdoor areas up to 25 feet from the public housing and administrative office buildings. (Emphasis added).

64.     Moreover, 24 CFR § 965.653 provides that "PHAs ***must*** design and implement a

policy prohibiting the use of prohibited tobacco products in all public housing living units and

interior areas . . . as well as in outdoor areas . . . ." (Emphasis added).  This section also provides

that "[a] PHA's smoke-free policy ***must***, at a minimum, ban the use of all prohibited tobacco

products."  (Emphasis added).

65.     Additionally, 24 CFR § 965.655, provides that "PHAs are ***required*** to implement

the requirements of this subpart . . . ."

66.     This is the exact type of explicit, naked "commandeering" of state and local

authorities that the anticommandeering rule was developed to prevent. The Smoking Ban is a federal regulatory program, or federal policy, and HUD has issued a direct command to the PHAs to implement and enforce this regulatory program or policy.

67. In *Murphy*, the Supreme Court identified the reasons for the anticommandeering doctrine: (a) it serves as "one of the Constitution's structural protections of liberty"; (b) it "promotes political accountability"; and (c) it "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477.

68. The Smoking Ban runs afoul of each of these three rationales: (a) the Ban is antithetical to the principles of liberty by requiring state and local agencies (PHAs) to subject their tenants to the requirements of a federal policy; (b) the Ban does not promote political accountability because the PHAs are left to implement and enforce the Rule while HUD, the creator of the Rule, is insulated from the grievances of tenants by remaining outside of the enforcement and implementation process; and (c) the Ban imposes burdensome operational costs relating to enforcement and implementation to state and local agencies.

69. For the foregoing reasons, the Smoking Ban violates the Tenth Amendment and the anticommandeering doctrine, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding that the Smoking Ban is contrary to the constitutional powers and privileges of HUD; and (ii) vacating the Smoking Ban.

    **B.**    **The Smoking Ban Violates the Fourth Amendment By Authorizing and Requiring PHAs to Engage in Unreasonable Searches and Seizures Targeting Adults Engaging in Legal Activities In the Privacy of Their Homes**

70. Adults have a fundamental right to engage in legal activities in the privacy of their homes, free from unreasonable searches and seizures, as guaranteed by the Fourth

Amendment.

71.     The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, *against unreasonable searches and seizures*, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.  (U.S. Cont. Am. IV)(Emphasis added).

72.     The Fourth Amendment, as incorporated through the Fourteenth Amendment, prohibits a state or any political subdivision thereof from subjecting individuals to unreasonable searches and seizures.  (U.S. Const. Am. XIV § 1).

73.     The use of tobacco products is a legal activity, the prohibition of which does not give government or State authorities a valid basis to enter a home.

74.     At issue here is not a fundamental right to smoke or use tobacco products, but *the fundamental right to engage in a legal activity in a private home*, free from unreasonable searches and seizures.  This is no different than an individual's right to drink his or her alcoholic beverage of choice or to eat fast food of his or her choosing in the privacy of the home.

75.     Although public housing is federally subsidized, it is legally no less a private place of residence subject to the protections of the Fourth Amendment than any other type of housing.

76.     Tenants of public housing are free from non-consensual, warrantless searches of their homes, just as tenants of other forms of housing are free from such searches. See e.g., *Pratt v. Chicago Hous. Auth.*, 155 F.R.D. 177 (D. Ill. 1994)

77.     For this reason, HUD's arguments about what regulations may be imposed upon inmates in prisons or other state-run facilities (such as psychiatric wards) are irrelevant in relation to the Smoking Ban, because inmates or psychiatric patients do not reside in private homes.  *See* 81 FR 87440 at fn. 11.

19

78.     In *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965), the Supreme Court recognized that "specific guarantees in the **Bill of Rights** have penumbras, formed by emanations from those guarantees that help give them life and substance.  Various guarantees create zones of privacy."  One of those zones of privacy is created by the Fourth Amendment, which explicitly affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Id.* (quoting U.S. Const. Am. IV).

79.     Four years earlier, in *Mapp v. Ohio*, 367 U.S. 643, 656-57 (1961), the Supreme Court laid the groundwork for the holding in *Griswold*:

> We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an "intimate relation" in their perpetuation of "principles of humanity and civil liberty [secured] . . . only after years of struggle" . . . . They express "supplementing phases of the same constitutional purpose -- to maintain inviolate large areas of personal privacy." *Id.* (internal citations omitted).

80.     Indeed, even far earlier than *Mapp*, the Supreme Court recognized the boundary of the home.  In *Boyd v. United States*, 116 U.S. 616, 630 (1886), the Court described the Fourth and Fifth Amendments as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life."

81.     Thus, government searches conducted without a warrant, particularly those of a private home, are *per se* unreasonable subject to only a few exceptions, one of which is if the government received consent to conduct the search.  See e.g., *Arizona v. Gant* 556 U.S. 332, 338 (2009). This is true not only for searches conducted by police officers for evidence of a crime, but also for administrative searches conducted for purposes of civil code enforcement (such as PHAs enforcing the Smoking Ban).  See e.g., *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 534 (1967).

20

82.     In the case at bar, the Smoking Ban, like any other regulation, is premised

on enforcement to ensure compliance.

83.     In order to enforce the Smoking Ban, PHAs will need to violate the Fourth

Amendment rights of tenants, because the prohibited activity will be occurring inside

the privacy of the tenants' units.  Detection of alleged violations will inevitably involve entry of

PHA officials into the tenants' "sphere of privacy" in order to engage in unconstitutional searches

and seizures to confirm the suspected use of tobacco products.

84.     HUD intentionally fails to address the enforcement issue in its Final Rule

Summary and instead claims that the PHAs will be left to enforce the Smoking Ban:

> HUD has not included enforcement provisions in this rulemaking because
> lease enforcement policies are typically at the discretion of PHAs, and it is
> appropriate for local agencies to ensure fairness and consistency with other
> policies.  (80 FR 87437).

85.     HUD's failure to provide specific enforcement mechanisms is telling.  HUD fails

to provide these mechanisms because there is no meaningful enforcement mechanism that can

make the Smoking Ban workable other than searches of tenants' private spaces or entry into

those spaces in order to verify supposed violations of the Smoking Ban, both of which would

violate the Fourth Amendment.

86.     The implementation and enforcement of the Smoking Ban violates and will

continue to violate the Fourth Amendment rights of Plaintiffs and all adult tenants of public

housing who engage in the legal activity of using tobacco in the privacy of their own homes.

87.     For the foregoing reasons, the Smoking Ban violates the Fourth Amendment,

and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding

that the Smoking Ban is contrary to the constitutional rights of Plaintiffs and all other

tenants of public housing similarly situated, to wit: their Fourth Amendment right to engage in

legal activities in the privacy of their homes, free from unreasonable searches and seizures;

and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate

the prohibition on the use of tobacco products within private living quarters.

> **C.**  **The Smoking Ban Violates Due Process Clauses of the Fifth and Fourteenth Amendments By Authorizing and Requiring PHAs to Violate the Fundamental Liberty of Individuals to be Free From Unwarranted Governmental Intrusion Into The Home**

88.     The Fifth Amendment restrains the Federal Government, and § 1 of the Fourteenth

Amendment restrains the states, from depriving any person of life, liberty, or property without

due process of law.

89.     The Fifth Amendment provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, *nor be deprived of life, liberty, or property, without due process of law*; nor shall private property be taken for public use, without just compensation.  (Emphasis Added)

90.     The Supreme Court's interpretation of "liberty" is the same for purposes of the

Fifth and Fourteenth Amendments.

91.      As Justice Kennedy wrote in the majority opinion in *Lawrence v. Texas*, 539 U.S.

558, 562 (2003):

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home.

92.     Under *Lawrence* and related Supreme Court decisions, adults have the

fundamental right (liberty) to engage in legal activities within the privacy of their own homes.

93.     In *Stanley v. Georgia*, the Supreme Court held that mere possession of obscene material in one's home could not be a crime and accordingly found unconstitutional a Georgia law targeting possession of these materials.  394 U.S. 557 (1969).  "For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Id*. at 564.

94.     Although *Stanley* was decided on First Amendment grounds, the Supreme Court later made clear that the sanctity of the home was at the core of the decision:

> In a later case, the Supreme Court noted that *Stanley* was not based on the notion that the obscene matter was itself protected by a constitutional penumbra of privacy, but rather was a 'reaffirmation that 'a man's home is his castle.' At the same time the Court noted, 'the Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education.' *Ravin v. State*, 537 P.2d 494 (Alaska 1975)(quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 6 (1973); *United States v. Orito*, 413 U.S. 139, 142 (1973))

95.     Indeed, as the Supreme Court stated in *Orito*:

> The Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education. It is hardly necessary to catalog the myriad activities that may be lawfully conducted within the privacy and confines of the home, but may be prohibited in public.  *Id*. at 142-143.

96.     In *New York City C.L.A.S.H. v. City of New York*, 315 F. Supp. 2d 461 (S.D.N.Y. 2004), the District Court for the Southern District of New York upheld various state and city smoking law amendments relating to regulation of smoking in *public* locations. However, the Court allowed that the result would be different were there to be intrusion into private locations:

> The Smoking Bans also do not attempt to intrude in such places that would be considered to be within a person's sphere of privacy, such as in a private residence, automobile, hotel room, or private social event, and thus, do not ruffle the implied right of privacy in the

"penumbras" of the Bill of Rights.  *Id*. at 479 fn. 13 (citing *Griswold*, 381 U.S. at 484-85).

97.     Again, at issue here is not a fundamental right to smoke or use tobacco products,

but *the fundamental right to engage in a legal activity in a private home*.  See *Orito*, 413 U.S. at

142-143.

98.     This right has also been recognized in some State Constitutions.  For example,

Alaska's Constitution provides: "The right of the people to privacy is recognized and shall not be

infringed."  (Alaska Const. Art. I, § 22).3

99.     As Court in *Ravin* recognized, consistent with Supreme Court precedent:

> If there is any area of human activity to which a right to privacy pertains more than
> any other, it is the home.  The importance of the home has been amply
> demonstrated by constitutional law.  537 P.2d at 503.

100.    Other State courts have recognized the Supreme Court's ample precedent in the

area of privacy in the home:

> Although it is conceivable that some legitimate public interest might warrant state
> interference with what an individual consumes, "Big Brother" cannot, in the name
> of *Public* health, dictate to anyone what he can eat or drink or smoke in
> the *privacy* of his own home.  *People v. Sinclair*, 387 Mich. 1 (1972)(emphasis in
> original).

101.    The Smoking Ban violates the Due Process Clauses of the Fifth and Fourteenth

Amendments by interfering with the fundamental liberty of individuals (in this case the Individual

Plaintiffs and similarly situated tenants of public housing) to engage in a legal activity within the

privacy of their homes.

102.    The Fifth and Fourteenth Amendments fundamentally protect the liberties of

individuals to make personal legal behavioral choices within the confines of their homes.

103.    For the foregoing reasons, the Smoking Ban violates the Fifth and Fourteenth

---

3 Hawaii has a similar provision. (Hawaii Const. Art. I, § 5).

Amendments, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding that the Smoking Ban is contrary to the constitutional rights of Plaintiffs and all other tenants of public housing similarly situated, to wit: their Fifth and Fourteenth Amendment liberty to engage in legal activities in the privacy of their homes, (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

> ### D.     The Smoking Ban Violates the "Unconstitutional Conditions Doctrine" By Conditioning Tenants' Receipt of the Benefit of Public Housing on Giving Up Their Fourth Amendment Rights

104.    The Supreme Court has stated in a number of contexts that "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government." *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994). This is known as the "unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist*., 133 S.Ct. 2586, 2594 (2013).

105.    As one district court put it, "the government cannot do indirectly that which it cannot do directly." *Lea Family P'Ship Ltd. v.  City of Temple Terrace*, 2017 U.S. Dist. LEXIS 46408 at *13 (citing *Koontz*, 133 S. Ct at 2594)

106.    Tenancy in public housing is a discretionary benefit conferred on Plaintiffs and all other tenants of public housing by PHAs together with HUD, which provides subsidies to the PHAs and sets regulations that the PHAs must follow.

107.    The Smoking Ban unconstitutionally forces Plaintiffs and all other adult tenants of public housing who choose to engage in the legal activity of using tobacco in the

25

privacy of their own homes to choose between their right to be free from unreasonable search and seizure in their homes on the one hand, and their tenancy in public housing on the other hand.

108.     Under the Smoking Ban, if Plaintiffs and all other similarly situated tenants of public housing accept the benefit of public housing, they are agreeing to submit to unreasonable search and seizure in violation of their Fourth Amendment rights.

109.     HUD, together with the PHAs, has coerced and will continue to coerce Plaintiffs and all other similarly situated tenants of public housing into acceptance of the Smoking Ban and forfeiture of their Fourth Amendment rights through the threat of eviction.

110.     HUD cannot legally coerce Plaintiffs and other tenants of public housing into accepting warrantless, non-consensual searches of their units in relation to enforcement of the Smoking Ban.

111.     Likewise, HUD cannot legally withhold the benefit of tenancy in public housing from Plaintiffs and other tenants of public housing if they choose to exercise their Fourth Amendment rights to be free from unreasonable searches of their units.

112.     For the foregoing reasons, the Smoking Ban violates the unconstitutional conditions doctrine, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding that the Smoking Ban is contrary to the constitutional rights of Plaintiffs and all other tenants of public housing similarly situated, to wit: their Fourth Amendment right to engage in legal activities in the privacy of their homes, free from unreasonable searches and seizures; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

   **E.     HUD Lacks Authority and Jurisdiction to Promulgate the Smoking Ban, as Congress May Not Regulate Intrastate Activities Which Do Not Have a "Substantial Effect" on Interstate Commerce or Are "Completely Internal,"**

**Including Smoking Bans In Private Residences**

113.     Prohibitions and restrictions on smoking, or where smoking may occur, have always been a matter of police power over public health, beyond Congress's power to regulate matters affecting interstate commerce and beyond Congress's power to grant authority to federal agencies to regulate.  This power is reserved to the States.

114.     Although Congress (and by extension, federal agencies acting pursuant to Congressional grants of authority) may exercise the federal power over commerce in order to undertake measures to regulate activities affecting public health in areas under *federal jurisdiction* (such as in national parks or on military bases), there is no federal police power with respect to the regulation of activities which are "completely internal . . . ."  *United States v. Lopez*, 514 U.S. 549, 594 (1995)(Thomas, J., concurring).

115.     Congress lacks power over activities that do not "substantially affect[]" interstate commerce.  *Id*. at 559.  Consequently, the general police power is retained by the States. *Id*. at 568.

116.     Yet, the Smoking Ban prohibits smoking within private living quarters in public housing, despite the fact that this activity has no discernible nexus to interstate commerce.  For that reason alone, the Ban is constitutionally defective.  Indeed, as one federal District Court neatly summarized, regulation of indoor air quality by the federal Government does not have a sound legal basis because there is no nexus with interstate commerce:

> Given the holdings in *United States v. Lopez*, 514 U.S 549 (1995) and *United States v. Hartsell*, 127 F.3d 343 (4th Cir. 1997), an argument may exist concerning where the federal government derives the authority to regulate indoor air quality, a patently intrastate environmental concern. Being neither interstate or commercial, ***it is unclear where indoor air finds a nexus with the instrumentalities of interstate commerce or how it substantially affects interstate commercial transactions***.  *Flue-Cured Tobacco Coop. Stabilization Corp. v. United States*

27

*EPA*, 4 F. Supp. 2d 435, 466 n. 38 (M.D.N.C. July 17, 1998)(internal citations edited)(emphasis added).

117.    Moreover, even *if* Congress's power over commerce did extend to regulation of smoking within private residences (which it most certainly does not), the Smoking Ban is a gross regulatory overreach in that it intrudes into the privacy of the home in a manner that goes far beyond the anti-smoking regulations that have been promulgated at the State and local levels, which generally relate to the regulation of tobacco use only in *public* locations.

118.    All fifty States have utilized their general police power to enact comprehensive anti-smoking and other tobacco use regulations.  However, no State prohibits the use of tobacco products in private residences except when used as a daycare center or for some other commercial purpose.4  In fact, almost all States explicitly exempt private homes unless used for daycare or commercial purposes.

119.    In *Lopez*, the Court considered the Gun-Free School Zones Act of 1990, which made it a federal offense to possess firearms in a school zone.  *Lopez*, 514 U.S. at 551.  However, as the Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce."  *Id*.  Therefore, the Act was constitutionally defective.  *Id*.

120.    Justice Kennedy, concurring, wisely observed the problems that may occur when the federal government infringes on the States' police power:

The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it

---

4 Many States prohibits smoking in private residences utilized as daycare centers or for a commercial purpose. See e.g., Arizona: 36-601.01 (Smoke-free Arizona Act); Arkansas: Act 96 of 1913, As Amended by Act 990 of 1991 (Ark. Code Ann. § 20-7-109(a)(1)) and Act 8 of the First Extraordinary Session of 2006 (Ark. Code Ann. § 20-27-1801-1809) (Clean Indoor Air Act);  California: Labor Code, Division 5. Safety in Employment Part 1, Chapter 3, 6404.5; Florida: Florida Clean Indoor Air Act. 386.203(1), 386.2045.

does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term. The tendency of this statute to displace state regulation in areas of traditional state concern is evident from its territorial operation. There are over 100,000 elementary and secondary schools in the United States. Each of these now has an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property. *Id*. at 583 (Kennedy, J., concurring)(internal citations omitted).

121.    With respect to public housing, there are approximately 1.2 million households living in public housing units, managed by approximately 3,300 PHAs.5  States have traditionally laid claim to anti-smoking regulations and other regulations relating to the use of tobacco products, just as the Gun-Free School Zones Act created an invisible federal zone around schools, the Smoking Ban creates *an invisible federal zone inside of private residences*.

122.    The *Lopez* Court also commented on *Gibbons v. Ogden*, 22 U.S. 1 (1824), in which the Court held that a federal law that licensed ships to engage in the "coasting trade" pre-empted a New York law granting a 30-year monopoly to Robert Livingston and Robert Fulton to navigate the State's waterways by steamship.  The Court in *Ogden* found that the federal power over commerce extended to commerce conducted partly within a State, however:

> At the same time, the Court took great pains to make clear that Congress could *not* regulate commerce "which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." Moreover, while suggesting that the Constitution might not permit States to regulate interstate or foreign commerce, the Court observed that "inspection laws, quarantine laws, **health laws** of every description, as well as laws for regulating the internal commerce of a State" were but a small part "of that immense mass of legislation . . . not surrendered to a general government."  **From an early moment, the Court rejected the notion that Congress can regulate everything that affects interstate commerce.** That the internal commerce of the States and the numerous state inspection, quarantine, and health laws had substantial effects on interstate commerce cannot be doubted. Nevertheless, they were not "surrendered to the general government." *Lopez*, 514 U.S. at 594 (citing *Ogden*)(internal citations omitted)(italics in original, bold added)(Thomas, J., concurring).

---

5 See HUD – "What is Public Housing?" – available at
https://www.hud.gov/program_offices/public_indian_housing/programs/ph (last visited May 16, 2018).

123.    Indeed, as regards *intrastate* matters, Congress has the authority to regulate only those activities that substantially affect interstate or foreign commerce. *Lopez*, 514 U.S. at 595 (Thomas, J. concurring).

124.    As Justice Thomas made clear in *Lopez*, health laws are the exclusive province of the States and their local subdivisions, even to the extent a matter of health may bear somewhat on interstate commerce.  The exclusive power of the States over matters of public health is all the more compelling when applied to matters (such as the non-public use of tobacco products) that occur within the sanctuary of private living quarters, where there is no discernible link to interstate commerce.

125.    In the December 5, 2016 Rule Summary, HUD inadvertently conceded that federal agencies do not have the power to promulgate anti-smoking regulations or other regulations relating to the use of tobacco products outside of areas under the jurisdiction of the particular agency, regardless of whether those areas are public or non-public locations:

> Courts have held that protecting persons from SHS  [secondhand smoke] is a valid use of the State's police power that furthers a legitimate government purpose.  (81 FR 87440)

126.    Further, in two footnotes, HUD notes that the basis for this assertion is "jurisprudence on smoking prohibitions in public areas and in the state prison context."  *Id*. at fn. 11.  HUD goes on to cite *Fagan v. Axelrod*, 550 N.Y.S.2d 552, 560 (N.Y. Sup. Ct. 1990) and *Chance v. Spears*, 2009 U.S. Dist. LEXIS 11034.

127.    However, HUD's reliance on both *Fagan* and *Chance* is misplaced.  *Chance* involved an inmate's Fourteenth Amendment Equal Protection challenge to a smoking ban adopted by the West Virginia Department of Corrections, *a state facility*, and certainly not a private residence.  *Chance*, 2009 U.S. Dist. LEXIS at*34-37.  *Fagan* involved a challenge by

tobacco users to the constitutionality of the 1989 New York State Clean Indoor Air Act, *a state law* that affected *only public locations*.  *Fagan*, 550 N.Y.S.2d at 552.

128.    Simply put, federal agencies are not permitted to promulgate anti-smoking regulations or other regulations relating to the use of tobacco products in relation to properties outside of federal jurisdiction, particularly in relation to private living quarters that have no link to interstate commerce, because Congress lacks the power to grant any such authority to federal agencies.  Accordingly, HUD does not now, nor has it ever had the authority to promulgate the Smoking Ban.

129.    For the foregoing reasons, the Smoking Ban was promulgated by the use of police powers constitutionally reserved to the States, and moreover promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and Plaintiffs are therefore entitled to a judgment (i) pursuant to 5 U.S.C. § 706(2)(B), holding that the Smoking Ban is an improper exercise of general police powers reserved to the States; (ii) pursuant to 5 U.S.C. § 706(2)(C), holding that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and (iii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

**F.      HUD Lacks Authority and Jurisdiction to Promulgate the Smoking Ban, as Neither Congress nor the Executive Branch Has Granted HUD or Any Other Federal Agencies Authority to Regulate the Use of Tobacco Products In Non-Public Locations**

130.    The Smoking Ban regulates the use of tobacco products in private living quarters.

131.    Neither HUD's organic statute nor any other statute gives HUD the authority or

31

jurisdiction to regulate the use of tobacco products in private living quarters.

132.    Certain agencies have been granted limited authority by Congress through the agencies' organic statutes or via Executive Order or other Executive document to regulate the use of tobacco products in public locations within the agency's jurisdiction, including the workplace. However, none have been granted authority to regulate the use of tobacco products in non-public locations.

133.    For example, the National Park Service ("NPS"), an agency within the Department of the Interior ("DOI"), has adopted a policy prohibiting smoking in the interior of all NPS-owned, leased, or administered buildings, within 25 feet of building entrances, within NPS vehicles, or in other areas designated by site managers.  *See*, United States Department of the Interior, National Park Service, Director's Order #50D: Smoking Policy (June 29, 2009)("Order #50D").

134.    Director's Order #50D rests on Congressional and Executive authority, including the National Park Service Organic Act (16 U.S.C. §§ 1 – 4), delegations of authority contained in Part 310 Chapter 11 of the Department of the Interior Manual (310 DM 11), and Executive Order 13058: "Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace" (issued August 9, 1997 by President Bill Clinton).

135.    Section 1 of Executive Order 13058 makes clear that the scope of the Order extends only to public locations:

> **Section 1**. Policy. It is the policy of the executive branch to establish a smoke-free environment for Federal employees and members of the public *visiting or using Federal facilities*. The smoking of tobacco products is thus prohibited *in all interior space owned, rented, or leased by the executive branch of the Federal Government*, and in any *outdoor areas* under executive branch control in front of air intake ducts. (Emphasis added).

136.    Part 310, which like Director's Order #50D, relies on Executive Order 13058,

establishes a smoking policy for all facilities occupied by the DOI:

> Smoking is prohibited in the interior space of all facilities occupied by and/or controlled by the Department of the Interior.  310 DM 11.2.

137.    Crucially, further demonstrating that there is no federal authority that grants

agencies the power to prohibit the use of tobacco products in non-public locations, Part 310

specifically excludes residential areas of DOI facilities:

> This policy does not extend to any *residential* accommodation for persons voluntarily or involuntarily residing, on a temporary or long-term basis, in a building owned, leased, or rented *by the Federal Government*. 310 DM 11.3(B) (emphasis added).

138.    There is a perfectly good reason why Congress has never granted *any* federal

agency the authority to regulate the use of tobacco products in non-public locations, and why

there is no Executive Order that grants such authority: use of tobacco products in non-public

locations has no connection whatsoever to interstate commerce and is outside the province of the

Federal Government.

139.    As there is no authority emanating from Congress or the President permitting

regulation of the use of tobacco products in non-public locations, HUD exceeded its authority in

promulgating the Smoking Ban.

140.    For the foregoing reasons, the Smoking Ban was promulgated in excess of

HUD's statutory jurisdiction, authority, and/or limitations and Plaintiffs are therefore entitled,

pursuant to 5 U.S.C. § 706(2)(C), to a judgment (i) holding that the Smoking Ban was

promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and

(ii) vacating the Smoking Ban; or, in the alternative to modifying the Smoking Ban

to eliminate the prohibition on the use of tobacco products within private living quarters.

**G.    HUD Lacks Authority and Jurisdiction to Promulgate the Smoking Ban, as**

**Neither Congress nor the Executive Branch Has Granted HUD or Any Other Federal Agencies Authority to Regulate Indoor Air Quality On a Nationwide Basis**

141.    One of the stated rationales of the Smoking Ban is "improvement of indoor air quality."

142.    However, neither HUD's organic statute nor any other statute gives HUD the authority or jurisdiction to regulate indoor air quality on a nationwide basis, particularly in areas such as private living quarters that have no connection to interstate commerce.

143.    While certain agencies have been granted limited authority by Congress through the agencies' organic statutes or via Executive Order or other Executive document to regulate tobacco use in the federal workplace, there is no statute that permits a federal agency to regulate indoor air in areas wholly beyond the jurisdiction of that agency.

144.    As the Court in *Flue-Cured Tobacco* opined (see paragraph 114 *supra*), regulation of indoor air by the federal Government does not have a sound legal basis because there is no " "nexus with the instrumentalities of interstate commerce or how it substantially affects interstate commercial transactions". *Flue-Cured Tobacco Coop*., v. 4 F. Supp. 2d at 466 n. 38.

145.    At the federal level, authority to promulgate rules to regulate indoor air with respect to tobacco smoke, particularly in relation to private homes, has not been granted to any agency. As there is no authority emanating from Congress or the President permitting nationwide regulation of indoor air quality, HUD exceeded its authority in promulgating the Smoking Ban.

146.    For the foregoing reasons, the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(C), to a judgment (i) holding that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and

34

(ii) vacating the Smoking Ban; or, in the alternative to modifying the Smoking Ban

to eliminate the prohibition on the use of tobacco products within private living quarters.

> **H.      HUD Lacks Authority and Jurisdiction to Promulgate the Smoking Ban, as Neither Congress nor the Executive Branch Has Granted HUD Specific Authority to Regulate the Use of Tobacco Products In Any Location, Whether Non-Public or Otherwise**

147.      Neither HUD's organic statute nor any other statute gives HUD the authority or

jurisdiction to regulate the use of tobacco products, whether in private living quarters *or anywhere*

*else*.

148.      In fact, the only federal agency specifically granted authority to promulgate

regulations relating to tobacco products is the Food and Drug Administration ("FDA"), an agency

within the U.S. Department of Health and Human Services ("HHS").

149.      Moreover, even the FDA's authority is limited to regulation of the tobacco

products directly, and for the most part not targeted at the *use* of the tobacco products.

150.      The FDA is responsible for protecting and promoting public health through the

control and supervision of, *inter alia*, food safety, tobacco products, dietary supplements,

pharmaceutical drugs, vaccines, biopharmaceuticals, blood transfusions, medical devices,

cosmetics, and veterinary products.

151.      In 2009, Congress expressed its clear intent that the FDA be the federal agency

vested with the authority to regulate tobacco products, enacting the Family Smoking Prevention

and Tobacco Control Act (the "FSPTCA").  (Pub.L. 111-31, H.R. 1256, amending the Federal

Food, Drug and Cosmetic Act (the "FDCA"), 21 U.S.C. §§ 301 *et seq*.).  The FSPTCA now gives

the FDA the power to regulate the tobacco industry that it did not have under the FDCA.

152.      The FSPTCA creates the Center for Tobacco Products to implement the FSPTCA;

requires tobacco companies to reveal all product ingredients; allows the FDA to change tobacco

product content; bans flavored cigarettes; delegates authority to the FDA to promulgate rules that

prevent tobacco sales except face-to-face exchanges between retailer and consumer; limits

advertising that could attract young smokers; sets requirements for prominent warning labels on

cigarette packages; and requires FDA approval for the use of advertising expressions that convey

that a particular tobacco product poses a reduced health risk.

153.    The FSPTCA was enacted in response to the Supreme Court's decision in *FDA v.

Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (1999), in which the Court, considering the

FDCA as a whole, held that Congress had not granted the FDA jurisdiction to regulated tobacco

products.

154.    In 1996, the FDA asserted jurisdiction to regulate tobacco products after having

expressly disavowed any such authority.  *Brown & Williamson*, 529 U.S. at 125 (citing 61 FR

44619-45318). The FDA's basis for asserting jurisdiction was that nicotine is a "drug" within the

meaning of the FDCA.  *Brown & Williamson*, 529 U.S. at 125.  Pursuant to this supposed

authority, the FDA promulgated regulations intended to reduce tobacco consumption among

children.  *Id*.

155.    However, as the court in *Brown & Williamson* noted:

> Regardless of how serious the problem an administrative agency seeks to address,
> however, it may not exercise its authority "in a manner that is inconsistent with the
> administrative structure that Congress enacted into law."  *Brown & Williamson*,
> 529 U.S. at 125 (citing *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517
> (1988)).

156.    Moreover, as the court in *Brown & Williamson* also observed:

> And although agencies are generally entitled to deference in the interpretation of
> statutes that they administer, a reviewing "court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress." *Brown & Williamson*, 529 U.S. at 125-126 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984)).

157.    The Court in *Brown* held that Congress "clearly precluded the FDA from jurisdiction to regulate tobacco products."  *Brown & Williamson*, 529 U.S. at 126.  The authority to regulate tobacco products was "inconsistent with the intent that Congress has expressed in the FDCA's overall regulatory scheme and in the tobacco-specific legislation that it has enacted subsequent to the FDCA."  *Id*.

158.    It was not until the enactment of the FSPTCA, which was enacted to amend the FDCA specifically in response to the decision in *Brown & Williamson*, that Congress specifically authorized the FDA to regulate tobacco products and specifically the FDA to reissue the invalidated 1996 regulations.  *Bullitt Fiscal Court v. Bullitt County Bd. of Health*, 434 S.W.3d 29, 38-39 (Sup. Ct. Kentucky 2014)(citing *Brown & Williamson*).

159.    Outside of the FSPTCA's grant of authority to the FDA to regulate tobacco products, Congress has not spoken specifically about the nationwide regulation of tobacco products except in several narrow instances spread across six separate pieces of legislation since 1965: requirements that health warnings appear on tobacco packaging and in printed and outdoor advertisements (*see* 15 U.S.C. §§ 1331, 1333, 4402); prohibition of advertising tobacco products through "any medium of electronic communication" subject to regulation by the Federal Communications Commission (FCC)(*see* 15 U.S.C. §§ 1335, 4402(f)); the requirement that the Secretary of HHS report to Congress every three years on research findings about "the addictive property of tobacco" (*see* 42 U.S.C. § 290aa-2(b)(2)); and the requirement that States' receipt of certain federal block grants are contingent on their making it unlawful "for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual

*under the age of 18,"* (*See* 42 U.S.C. § 300x-26(a)(1)).

160.     With respect to HUD, there is no administrative structure created by Congress that would permit the agency to regulate tobacco products *or* their use on nationwide basis, which is what HUD is doing in promulgating the Smoking Ban affecting approximately 1.2 million households under the control of approximately 3,300 PHAs nationwide.

161.     In the absence of specific authority emanating from Congress to supplement HUD's organic statute, HUD is prohibited from regulating the *behavior* of public housing tenants (use of tobacco products) as much as regulation of the tobacco products themselves.

162.     To the extent *any* agency, including the FDA, would seek to regulate tobacco products or their use in private residences, there is no Congressional authority whatsoever for such regulation.  Nonetheless, as the FDA is the proper agency to regulate tobacco products or their use on a nationwide basis, HUD would be in excess of its authority with respect to promulgation of *any* anti-smoking regulation, let alone one relating to tobacco use in private living quarters.

163.      For the foregoing reasons, the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(C), to a judgment (i) holding that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

**I.      The Smoking Ban is Arbitrary, Capricious, and an Abuse of Discretion**

164.     In support of the Smoking Ban, HUD relies on several health-related

rationales, asserting that the Ban will "improve indoor air quality in the housing, benefit the health of public housing tenants and PHA staff, [and] reduce the risk of catastrophic fires."  These rationales are arbitrary, capricious, and an abuse of discretion because (a) they are not based on sound scientific principles, (b) the subjects of indoor air quality, public health, and fire prevention are not within HUD's area of agency expertise, (c) none of these rationales justify the gross invasion of privacy and the sanctity of the home caused by the Ban, (d) none of these rationales justify a "one-size fits all" nationwide policy that fails to account for local conditions, and (e) the Ban will actually cause harm to public housing tenants who use tobacco products, and prevent none for non-smokers living in other apartments.

165.    The Smoking Ban is predicated on the scientifically dubious notion that the tobacco product emissions produced by public housing tenants using tobacco products within their private living quarters poses a health risk to tenants living in other apartments.

166.    To date, there is no scientific study in existence that has reliably quantified harm to anyone living in an apartment where there is smoking that is occurring in another apartment.

167.    As well, HUD cites no credible data or studies in support of its fire-prevention rationale.

168.    HUD is not the appropriate agency to promulgate regulations addressing the issue of smoking and its impact on the health of residents in all other apartments, or addressing fire prevention, because HUD's expertise is limited to housing policy and not public health or the science underlying smoking or fire prevention.

169.    Moreover, the Smoking Ban targets a particular *behavior* (use of tobacco products), and a legal one at that.  HUD's agency mission relates to housing policy, not regulation

of adult behavior.  Targeting adult behavior through regulation that has nothing to do with

housing policy is as much an abuse of discretion as HUD's trespass into the areas of health and

science.

170.    HUD seeks to impose smoking cessation on adults who choose to smoke, as

evidenced by the manner in which the Proposed Rule Summary and Final Rule Summary promote

the purported benefits of smoking cessation.  Indeed, in its Regulatory Impact Analysis for the

Smoking Ban, HUD touts the supposed health and financial benefits to smokers by stating that

"[s]uch a positive outcome is desired by HUD."[6]  This sort of foray into public health policy goes

well beyond the agency's mission and powers.

171.    Most importantly, the Smoking Ban represents an abuse of discretion because

it authorizes PHAS to invade the private living quarters of public housing tenants, who have a

right to quiet enjoyment of their homes free from governmental intrusion as much as a resident of

any other form of housing.

172.    Given the lack of credible scientific support for the Smoking Ban, and how

no health benefits are gained by non-smokers living in other apartments, the egregious invasion of

tenants' privacy is a particularly abusive use of HUD's powers.  As the *British Medical Journal*

wrote:

> Homes are assumed to be the 'castles' of their occupants, where a wide range of
> private freedoms of expression are sanctified that are prohibited in public. It
> would seem inconceivable in any but the most authoritarian states for smoking to
> be banned in homes.[7]

---

6 See HUD, "REGULATORY IMPACT ANALYSIS – Instituting Smoke-Free Public Housing – Final Rule" at p.
27-13 (Dec. 5, 2016) – available at https://www.regulations.gov/document?D=HUD-2015-0101-1014
7 The future of smoke-free legislation, *British Medical Journal* 2007; 335:521
available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1976495/

173.    The lack of credible scientific evidence underpinning the Smoking Ban also

shows the arbitrariness of attempting to impose a nationwide rule on public housing tenants who

live in a wide variety of local conditions that vary widely, from connected apartments, to

unattached houses, to mobile homes.

174.    For example, when former NYCHA Commissioner Shola Olatoye was recently

asked about bringing free WiFi access to public housing, she was quoted in a local publication as

saying that the walls of NYCHA public housing are  'constructed like fortresses,' with the

implication being that this would make WiFi access difficult.8  This raises the question of how

particles of tobacco emissions could harm residents of other apartments if even WiFi

signals cannot penetrate the walls of NYCHA public housing buildings.  While the walls may not

be so thick at another public housing location, the point remains the same: a one-size fits all

nationwide smoking ban is inappropriate when the PHAs are in the best position to determine

what is appropriate based on local architectural and demographic conditions, among other factors.

175.    The Smoking Ban is also arbitrary and an abuse of discretion because it poses

a substantial risk of harm to tenants of public housing by forcing them to leave the relative safety

of their homes and venture out into often dangerous public areas.

176.    Many public housing buildings and their surroundings are plagued by

extraordinarily high levels of crime.9  Residents who could previously use tobacco products in the

relative safety of their own homes, including women, the elderly, and disabled persons will now

---

8 Still simmering: Public housing residents will wait another two winters for
permanent boilers, *Courier Life's Brooklyn Daily*, 12/10/15, available at
http://www.brooklyndaily.com/stories/2015/50/all-nycha-shola-olatoye-2015-12-11-
bk.html
9 See e.g., Murders at NYCHA buildings add up despite efforts to bring crime down.| NY
Daily New, 7/5/15, available at http://www.nydailynews.com/new-york/nyc-crime/exclusive-murders-nycha-
buildingsadd-article-1.2281875

be forced to venture out into more dangerous surroundings where they are exposed to a
dramatically increased risk of becoming a crime victim while they engage in the legal activity of
tobacco use.

177.    As described by a tenant association president in New York City in an article
appearing in *The Daily News*, tenants of public housing already have enough to worry about when
it comes to crime:

> Many of the working people and elderly who make up the vast majority of New
> York City Housing Authority residents live in a constant state of hyper-awareness
> to avoid becoming a victim… For many NYCHA tenants, stepping alone into an
> elevator or returning from the drugstore as the sun drops below the horizon can
> be a heart-thumping moment… Across NYCHA, the constant threat of random
> confrontation alters behavior. Tenants come home from work and stay in all
> night. At the Lincoln Houses in East Harlem, an elderly tenant dashed to the back
> of her apartment when a bullet ripped through the window. 'Since then she
> doesn't like to come outside,' said Herman, Lincoln's tenant association
> president. 'She is fearful, apprehensive — even going to her mailbox.' Herman
> describes tenants living in a constant state of anxiety: 'There's fear all around
> here. You never know when someone's going to pop out shooting at someone.'10

178.    In other instances, public housing tenants, forced to leave the premises of their
building entirely, will have no choice but to engage in tobacco smoking along dangerous
roadways or other unsafe areas, where they risk serious injury instead of being able to enjoy a
legal activity within the safety of their own homes.  This has been and will continue to be a result
of the HUD's requirement that the Smoking Ban's must extend to all outdoor areas up to 25 feet
from the housing and administrative office buildings.

179.    In still other instances, public housing tenants, including elderly and disabled
persons who are unable to leave their apartments without extraordinary difficulty, will suffer

---

10 NYCHA units see spike in crime that outpaces city, leaving residents in fear. *NY Daily News*, 4/6/14
available at http://www.nydailynews.com/new-york/nyc-crime/nycha-residents-live-fear-majorcrimes-
public-housing-soar-article-1.1747195

needless anxiety, depression, stress and disruption to their daily routines by not being able to smoke.  Moreover, leaving and returning to apartments in public housing is often as difficult as it is dangerous, as public housing buildings are all too frequently plagued by broken elevators, poorly lit stairwells, and other hazardous physical conditions.  In this way, elderly and disabled tenants who cannot negotiate stairs are forced to accept the behavioral choice that HUD has made for them.  For example, according to the *New York Post*:

> NYCHA elevators broke an average of 13 times a year during 2016, when a majority of buildings 'had at least one period with no functioning elevator service' at all, leaving elderly and disabled tenants 'stranded in the lobby of their building.'11

180.    The Smoking Ban will also unnecessarily subject public housing tenants, again including elderly and disabled person, to the misery and potential dangers of extreme cold and heat, inclement weather, and other natural perils, as a result of their being forced to leave the relative safety of their buildings in order to engage in a legal activity.

181.    These are just several examples of the arbitrary manner in which the Smoking Ban will inflict potentially dangerous situations upon tenants of public housing for the sake of unsubstantiated claims of benefits to health for those residing in another apartment.

182.    The arbitrary and unfair result of the Smoking Ban for tenants who live in dangerous public housing and choose to smoke is either (i) that they are forced to leave their apartments and venture 25 or more additional feet, thereby risking possible danger; (ii) or for those who are unable due to physical inability/lack of mobility, being forced to give up their right to engage in a legal activity in their homes, all under coercive pain of *losing* their homes.

183.    For the foregoing reasons, the Smoking Ban is arbitrary, capricious, and an

---

11 See "NYCHA admits atrocious living conditions," *New York Post*, June 11, 2018, available at: https://nypost.com/2018/06/11/nycha-takes-responsibility-for-atrocious-living-conditions

abuse of HUD's discretion, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(A), to a judgment (i) holding that the Smoking Ban is arbitrary, capricious, and an abuse of discretion; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

## CAUSES OF ACTION

### COUNT ONE
**Judgment Pursuant to 5 U.S.C. § 706(2)(B) -
Violation of the Administrative Procedure Act Through Violation of the Tenth Amendment
of the United States Constitution and the Anticommandeering Doctrine**

184.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

185.    The Smoking Ban, adopted by HUD, requires PHAs to implement and enforce the Ban.

186.    HUD is a federal agency.

187.    PHAs are state and local agencies.

188.    The Tenth Amendment provides for a system of dual sovereignty.

189.    Under this system of dual sovereignty, the Federal Government may not direct, instruct, order and/or require a state or local governments, or their subdivisions, to implement and enforce a federal regulatory program and/or policy.  This is the anticommandeering doctrine.

190.    By requiring PHAs to implement and enforce the Smoking Ban, HUD is directing, instructing, ordering and requiring PHAs to implement and enforce a federal regulatory program and/or policy, to wit: the Smoking Ban and its particular provisions.

191.    Therefore, HUD is in violation of the anticommandeering doctrine, and by

extension, the Tenth Amendment.

192.   Accordingly, Plaintiffs are entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding that the Smoking Ban is contrary to the constitutional powers and privileges of HUD; and (ii) vacating the Smoking Ban.

## COUNT TWO
### Violation of the Tenth Amendment - Anticommandeering Doctrine

193.   Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

194.   HUD requires PHAs to implement and enforce the Smoking Ban.

195.   HUD is a federal agency.

196.   PHAs are state and local agencies.

197.   The Tenth Amendment provides for a system of dual sovereignty.

198.   Under this system of dual sovereignty, the Federal Government may not direct, instruct, order and/or require a state or local governments, or their subdivisions, to implement and enforce a federal regulatory program and/or policy.  This is the anticommandeering doctrine.

199.   By requiring PHAs to implement and enforce the Smoking Ban, HUD is directing, instructing, ordering and requiring PHAs to implement and enforce a federal regulatory program and/or policy, to wit: the Smoking Ban and its particular provisions.

200.   Therefore, HUD is in violation of the anticommandeering doctrine, and by extension, the Tenth Amendment.

201.   Accordingly, Plaintiffs are entitled to a declaration that the Smoking Ban violates the Tenth Amendment, and judgment vacating the Smoking Ban.

## COUNT THREE

**Judgment Pursuant to 5 U.S.C. § 706(2)(B) -**
**Violation of the Administrative Procedure Act Through Violation of the Fourth and**
**Fourteenth Amendments of the United States Constitution**

202.     Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of

the Complaint as if set forth at length herein.

203.     HUD requires PHAs to enforce the Smoking Ban.

204.     Enforcement of the Smoking Ban will necessarily require invasion of the private

living quarters of public housing tenants who are suspected of using tobacco products, including

but not limited to Plaintiffs.

205.     Public housing tenants, including but not limited to Plaintiffs, have a constitutional

right to engage in legal activities within their private living quarters without being subjected to

search and seizure.

206.     Accordingly, the Smoking Ban violates the Fourth Amendment as incorporated

through the Fourteenth Amendment, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. §

706(2)(B), to a judgment (i) holding that the Smoking Ban is contrary to the constitutional

rights of Plaintiffs and all other tenants of public housing similarly situated, to wit: their Fourth

Amendment right to engage in legal activities in the privacy of their homes, free from

unreasonable searches and seizures; and (ii) vacating the Smoking Ban; or, in the alternative,

modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within

private living quarters.

**COUNT FOUR**
**Violation of the Fourth and Fourteenth Amendments of the United States Constitution**

207.     Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of

the Complaint as if set forth at length herein.

46

208.    HUD requires PHAs to enforce the Smoking Ban.

209.    Enforcement of the Smoking Ban will necessarily require invasion of the private living quarters of public housing tenants who are suspected of using tobacco products, including but not limited to Plaintiffs.

210.    Public housing tenants, including but not limited to Plaintiffs, have a constitutional right to engage in legal activities within their private living quarters without being subjected to search and seizure.

211.    Accordingly, Plaintiffs are entitled to a declaration that the Smoking Ban violates the Fourth Amendment as incorporated through the Fourteenth Amendment, and judgment vacating the Smoking Ban.

## COUNT FIVE
### Judgment Pursuant to 5 U.S.C. § 706(2)(B) -
### Violation of the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution

212.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

213.    The Fifth Amendment restrains the Federal Government, and § 1 of the Fourteenth Amendment restrains the states, from depriving any person of life, liberty, or property without due process of law.

214.    The Smoking Ban violates the Due Process Clauses of the Fifth and Fourteenth Amendments by interfering with the fundamental liberty of individuals (in this case the Individual Plaintiffs and similarly situated tenants of public housing) to engage in a legal activity within the privacy of their homes.

215.    Accordingly, Plaintiffs entitled, pursuant to 5 U.S.C. § 706(2)(B), to a

judgment (i) holding that the Smoking Ban is contrary to the constitutional rights of Plaintiffs and all other tenants of public housing similarly situated, to wit: their Fifth and Fourteenth Amendment liberty to engage in legal activities in the privacy of their homes, and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

## COUNT SIX
### Violation of the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution

216.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

217.    The Fifth Amendment restrains the Federal Government, and § 1 of the Fourteenth Amendment restrains the states, from depriving any person of life, liberty, or property without due process of law.

218.    The Smoking Ban violates the Due Process Clauses of the Fifth and Fourteenth Amendments by interfering with the fundamental liberty of individuals (in this case the Individual Plaintiffs and similarly situated tenants of public housing) to engage in a legal activity within the privacy of their homes, to wit: the use of tobacco products.

219.    Accordingly, Plaintiffs entitled to a declaration that the Smoking Ban violates the Due Process Clauses of the Fifth and Fourteenth Amendments, and judgment vacating the Smoking Ban.

## COUNT SEVEN
### Judgment Pursuant to 5 U.S.C. § 706(2)(B) -
### Violation of the Administrative Procedure Act Through Violation of the Unconstitutional Conditions Doctrine

220.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of

the Complaint as if set forth at length herein.

221.    HUD requires PHAs to implement and enforce the Smoking Ban.

222.    As part of the Smoking Ban's implementation, PHAs are requiring public housing tenants, including but not limited to Plaintiffs, to sign lease addendums in which the tenants agree to refrain from the use of tobacco products inside their apartments or face eviction.

223.    Implementation of the Smoking Ban thus results in public housing tenants facing the choice of giving up their Fourth Amendment rights to be free from unreasonable search and seizure while engaging in legal activities within the privacy of their living quarters on the one hand, or be evicted on the other hand.

224.    In this manner, the Smoking Ban unconstitutionally conditions tenants' receipt of the benefit of public housing on giving up their Fourth Amendment rights.

225.    Accordingly, the Smoking Ban violates the unconstitutional conditions doctrine, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding that the Smoking Ban is contrary to the constitutional rights of Plaintiffs and all other tenants of public housing similarly situated, to wit: their Fourth Amendment right to engage in legal activities in the privacy of their homes, free from unreasonable searches and seizures; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

## COUNT EIGHT
### Judgment Pursuant to 5 U.S.C. § 706(2)(B) -
### Violation of the Administrative Procedure Act Through Promulgation of Regulation Contrary to Constitutional Authority/Powers (Usurpation of General Police Powers Reserved to the States)

226.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

49

227.    Regulation of public health, including regulation of the use of tobacco products, is a matter reserved for the States and their local subdivisions pursuant to their general police powers.

228.    The federal government does not have a general police power.

229.    Congress's power over intrastate matters such as regulation of the use of tobacco products is limited to matters substantially affecting interstate commerce.

230.    Regulation of the use of tobacco products has historically been the prerogative of the States and their police powers.

231.    The use of tobacco products *within private living quarters* is completely unrelated to interstate commerce and, to the extent such use is to be regulated, it  is a matter of State and local concern subject to the police powers of the States.

232.    Accordingly, the Smoking Ban was promulgated contrary to the constitutional powers of the federal government and in usurpation of the general police power reserved to the States, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(B), to a judgment (i) holding that the Smoking Ban was promulgated contrary to the constitutional powers of the federal government generally and HUD specifically, and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

**COUNT NINE**
**Judgment Pursuant to 5 U.S.C. § 706(2)(C) -**
**Violation of the Administrative Procedure Act Through Promulgation of Regulation in Excess of Agency Authority and Jurisdiction (Lack of Authority and Jurisdiction to Regulate Matters Reserved to the States)**

233.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of

50

the Complaint as if set forth at length herein.

234.    Regulation of public health, including regulation of the use of tobacco products, is a matter reserved for the States and their local subdivisions pursuant to their general police powers.

235.    The federal government does not have a general police power.

236.    Congress's power over intrastate matters such as regulation of the use of tobacco products is limited to matters substantially affecting interstate commerce.

237.    Regulation of the use of tobacco products has historically been the prerogative of the States and their police powers.

238.    The use of tobacco products *within private living quarters* is completely unrelated to interstate commerce and, to the extent such use is to be regulated, it is a matter of State and local concern subject to the police powers of the States.

239.    Accordingly, the Smoking Ban was promulgated in excess of HUD's agency authority and jurisdiction and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(C), to a judgment (i) holding that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

**COUNT TEN**
**Judgment Pursuant to 5 U.S.C. § 706(2)(C) -**
**Violation of the Administrative Procedure Act Through Promulgation of Regulation in Excess of Agency Authority and Jurisdiction (Lack of Authority and Jurisdiction to Regulate the Use of Tobacco Products in Non-Public Locations)**

240.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

241.    The Smoking Ban regulates the use of tobacco products in private living

quarters within public housing.

242.    Certain agencies have been granted limited authority by Congress through the

agencies' organic statutes or via Executive Order or other Executive document to regulate the use

of tobacco products in public locations within the agency's jurisdiction, including the workplace.

243.    However, no federal agencies have the authority to regulate the use of tobacco

products in private living quarters or other non-public locations, as the use of tobacco products in

private living quarters and other non-public locations has no connection whatsoever to interstate

commerce and is outside the province of the Federal Government.

244.    Accordingly, the Smoking Ban was promulgated in excess of HUD's agency

authority and jurisdiction and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(C), to

a judgment (i) holding that the Smoking Ban was promulgated in excess of HUD's statutory

jurisdiction, authority, and/or limitations; and (ii) vacating the Smoking Ban; or, in the alternative,

modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within

private living quarters.

**COUNT ELEVEN**
**Judgment Pursuant to 5 U.S.C. § 706(2)(C) -**
**Violation of the Administrative Procedure Act Through Promulgation of Regulation in**
**Excess of Agency Authority and Jurisdiction (Lack of Authority and Jurisdiction to**
**Regulate Indoor Air Quality On a Nationwide Basis)**

245.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of

the Complaint as if set forth at length herein.

246.    The Smoking Ban regulates the use of tobacco products, with the stated goal of

improving indoor air quality.

52

247.    While certain agencies have been granted limited authority by Congress through the agencies' organic statutes or via Executive Order or other Executive document to regulate the use of tobacco products at indoor federal workplace locations, no federal agencies have nationwide authority to regulate indoor air quality.

248.    Accordingly, the Smoking Ban was promulgated in excess of HUD's agency authority and jurisdiction and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(C), to a judgment (i) holding that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

## COUNT TWELVE
### Judgment Pursuant to 5 U.S.C. § 706(2)(C) –
### Violation of the Administrative Procedure Act Through Promulgation of Regulation in Excess of Agency Authority and Jurisdiction (Lack of Authority and Jurisdiction to Regulate the Use of Tobacco Products in Any Locations)

249.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

250.    The Smoking Ban regulates the use of tobacco products in private living quarters within public housing on a nationwide basis.

251.    With the exception of the FDA, Congress has not granted any federal agency specific nationwide regulatory power over tobacco products or their use.

252.    Nor does HUD's organic statute contain any authority supporting the promulgation of any kind of regulation relating to the use of tobacco products.

253.    Accordingly, the Smoking Ban was promulgated in excess of HUD's agency authority and jurisdiction and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(C), to

a judgment (i) holding that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

**COUNT THIRTEEN**
**Judgment Pursuant to 5 U.S.C. § 706(2)(A) -**
**Violation of the Administrative Procedure Act Through Adoption of Regulation That Is**
**Arbitrary, Capricious, and an Abuse of Discretion**

254.    Plaintiffs repeat and reallege the allegations set forth in all prior paragraphs of the Complaint as if set forth at length herein.

255.    The Smoking Ban is arbitrary, capricious, and an abuse of discretion because (a) it is not based on sound scientific principles, (b) the subjects of indoor air quality, public health, and fire prevention are not within HUD's area of agency expertise, (c) none of HUD's rationales justify the gross invasion of privacy and the sanctity of the home caused by the Ban, (d) none of HUD's rationales justify a "one-size fits all" nationwide policy that fails to account for local conditions, and (e) the Ban will actually cause harm to public housing tenants who use tobacco products, even as it fails to prevent harm to other tenants.

256.    Accordingly, the Smoking Ban is arbitrary, capricious, and an abuse of HUD's discretion, and Plaintiffs are therefore entitled, pursuant to 5 U.S.C. § 706(2)(A), to a judgment (i) holding that the Smoking Ban is arbitrary, capricious, and an abuse of discretion; and (ii) vacating the Smoking Ban; or, in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

(a) Pursuant to 5 U.S.C. § 706(2)(A), that the Smoking Ban is arbitrary, capricious,

54

and an abuse of HUD's discretion;

(b) Pursuant to 5 U.S.C. § 706(2)(B), that the Smoking Ban was promulgated contrary to the constitutional rights of Plaintiffs and all other similarly situated tenants of public housing nationwide;

(c) Pursuant to 5 U.S.C. § 706(2)(C), that the Smoking Ban was promulgated in excess of HUD's statutory jurisdiction, authority, and/or limitations;

(d) Pursuant to 5 U.S.C. § 706(2)(A), (B), and (C), vacating the Smoking Ban; or in the alternative, modifying the Smoking Ban to eliminate the prohibition on the use of tobacco products within private living quarters; and

(e) Pursuant to 28 U.S.C. §2412 and any other applicable provisions of law or equity, award Plaintiffs' costs and reasonable attorneys' fees.

(f) Such other relief as may be just and proper.


Dated: July 23, 2018                                  Respectfully submitted,

                                                      /s/ Lawrence J. Joseph
                                                      _____

Edward A. Paltzik, Esq.                               Lawrence J. Joseph, D.C. Bar No. 464777
    *pro hac vice* motion forthcoming                     Local Counsel
JOSHPE MOONEY PALTZIK LLP                              LAW OFFICE OF LAWRENCE J. JOSEPH
360 Lexington Avenue, Suite 1502                       1250 Connecticut Ave, NW, Suite 700-1A
New York, New York 10018                               Washington, DC 20036
Tel: 212-421-8100                                      Tel: 202-355-9452
Cell: 516-526-0341                                     Fax: 202-318-2254
Fax: 212-313-9478                                      Email: ljoseph@larryjoseph.com
Email: epaltzik@jmpllp.com