# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NYC C.L.A.S.H., INC.,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 18-1711 (ESH)** |
| **BEN CARSON, SECRETARY OF DEP'T OF HOUSING & URBAN DEVELOPMENT,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, a smokers' rights organization and six individual smokers who reside in public housing, have brought this action against the U.S. Department of Housing and Urban Development ("HUD") and Ben Carson, the Secretary of HUD, challenging a regulation that bans smoking in public housing, including in individual residential units. Plaintiffs claim that the regulation violates the Fourth, Fifth, Tenth, and Fourteenth Amendments and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* Before the Court are the parties' cross-motions for summary judgment. For the reasons stated herein, the Court will grant defendants' motion for summary judgment and deny plaintiffs' motion.

## BACKGROUND

## I.     STATUTORY AND REGULATORY FRAMEWORK

In order to "remedy the unsafe housing conditions and the acute shortage of safe dwellings for low-income families," Congress passed the Housing Act, which provides funding to state and local agencies that develop and operate public housing ("public housing agencies" or

"PHAs").[1]  42 U.S.C. §§ 1437, 1437c, 1437g.  Congress tasked HUD with disbursing this funding and ensuring that its use furthered the purposes of the Act.  Section 1437d(f)(1) provides that "[e]ach contract for contributions for a public housing agency shall require that the agency maintain its public housing in a condition that complies with standards which meet or exceed the housing quality standards established under paragraph (2)."  Congress required in paragraph (2) that:

> The Secretary shall establish housing quality standards under this paragraph that ensure that public housing dwelling units are safe and habitable. Such standards shall include requirements relating to habitability, including maintenance, health and sanitation factors, condition, and construction of dwellings . . . .

42 U.S.C. § 1437d(f)(2).  Thus, PHAs are required to agree to comply with HUD's housing quality standards in exchange for public housing funding.  42 U.S.C. §§ 1437d(f)(1); *see also* Form HUD-53012A § 5 (incorporating HUD regulations and any amendments to them into HUD's contracts with PHAs).

Citing to its authority under Section 1437d, HUD proposed a rule in 2015 banning smoking in federally funded public housing.  Instituting Smoke-Free Public Housing, 80 Fed. Reg. 71,762 (proposed November 17, 2015).  After a period of notice and comment, HUD promulgated a final rule (the "Smoke Free Rule" or the "Rule"), which became effective on February 3, 2017.  Instituting Smoke-Free Public Housing, 81 Fed. Reg. 87,430.  In its final

---

[1] The Housing Act defines a PHA as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing, or a consortium of such entities or bodies . . . ."  42 U.S.C. § 1437a(b)(6)(A).

form, the Smoke Free Rule bans the use of all lit tobacco products, including cigarettes, cigars, pipes, and waterpipes.[2]  The ban applies to

> all public housing living units and interior areas (including but not limited to hallways, rental and administrative offices, community centers, day care centers, laundry centers, and similar structures), as well as in outdoor areas within 25 feet from public housing and administrative office buildings (collectively, "restricted areas") in which public housing is located.

24 C.F.R. § 965.653(a), (c).[3]  HUD's stated purpose for the Rule was fourfold: (1) to "improve indoor air quality in the housing;" (2) to "benefit the health of public housing residents, visitors, and PHA staff;" (3) to "reduce the risk of catastrophic fires;" and (4) to "lower overall maintenance costs."  81 Fed. Reg. at 87,431.

To effectuate the Rule, HUD amended the existing regulation setting forth lease requirements to include a requirement that all future PHA leases provide that the tenants will abide by the Smoke Free Rule.  24 C.F.R. § 966.4(f)(12).  HUD also required PHAs to amend existing leases to explicitly incorporate the terms of the Rule.  24 C.F.R. § 965.655(a)(2).  A tenant's failure to comply with his lease agreement, and thus, the Rule, could lead to termination of the tenancy and eviction.  24 C.F.R. § 966.4(*l*)(2)(i)(B).  All PHAs were required to be in full compliance with the Rule by July 30, 2018.  24 C.F.R. § 965.655(b).

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are New York City Citizens Lobbying Against Smoker Harassment ("NYC C.L.A.S.H."), a nonprofit organization "dedicated to protecting the interests of adults who

---

[2] The Smoke Free Rule does not ban the use of electronic nicotine delivery systems, such as electronic cigarettes.  80 Fed. Reg. at 71,765; *see also* 81 Fed. Reg. at 87,436.

[3] The Rule allows PHAs to designate smoking areas on public housing grounds "in order to accommodate residents who smoke," as long as those areas are "outside of any restricted areas."  24 C.F.R. § 965.653(b).

smoke," and six individuals who are smokers and who live in public housing funded by HUD.[4] (Pls.' Mem. Supp. Summ. J. at 2–3, ECF No. 26-1 ("Pls.' Mem.").)  They initiated this action on July 23, 2018, against HUD and Carson, in his official capacity.  The complaint alleges that the Smoke Free Rule violates the anticommandeering principle of the Tenth Amendment (Counts One and Two), the Fourth Amendment's ban on unreasonable searches and seizures (Counts Three and Four), the Due Process Clause of the Fifth Amendment (Counts Five and Six), and the unconstitutional conditions doctrine (Count Seven).  The complaint further alleges that the Rule is not a proper exercise of Congress' Commerce Clause power (Counts Eight and Nine), that HUD did not have the statutory authority to promulgate the Rule (Counts Ten, Eleven, and Twelve), and that the Rule is arbitrary, capricious, and an abuse of discretion (Count Thirteen).[5] Plaintiffs seek vacatur of the Rule, or, alternatively, modification of the Rule to eliminate the ban on smoking in private residences.

The parties have filed cross-motions for summary judgment, which have been fully briefed.  (*See* Pls.' Mot. for Summ. J., ECF No. 26; Defs.' Cross Mot. for Summ. J., ECF No. 33 ("Defs.' Mot."); Defs.' Resp. to Pls.' Mot. for Summ. J., ECF No. 34; Pls.' Opp. to Defs.' Cross Mot., ECF No. 37 ("Pls.' Opp."); Pls.' Reply to Defs.' Resp., ECF No. 38; Defs.' Reply to Pls.' Opp., ECF No. 40 ("Defs.' Reply").)

---

[4] The six individual plaintiffs are William Donnell, Nathan Fields, Chanel Folks, Digna Rodriguez, Douglas Soncksen, and Jamie Ward.  (Pls.' Mem. at 2–3.)

[5] Plaintiffs' constitutional challenges are brought directly under the applicable constitutional provision in Counts Two, Four, and Six and under § 706 of the APA in Counts One, Three, and Five.  Counts Seven through Thirteen are also brought under the APA.

# ANALYSIS

## I.    LEGAL STANDARDS

### A.  Constitutional Claims

Under Federal Rule of Civil Procedure 56(a), summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Because the parties' statements of facts and responses thereto reveal no genuine disputes of material fact, the Court need only determine whether either party is entitled to judgment as a matter of law.

### B.  APA Claims

Plaintiffs' claims brought under the APA are not governed by Rule 56 "because of the limited role of a court in reviewing the administrative record" under the APA. *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013). Under that statute

> it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)). Under the APA, a court may hold an agency action unlawful when it is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

An agency rule is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter

> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). This

standard of review is "highly deferential" and "presumes the validity of agency action." *Nat'l*

*Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citation, alteration,

and internal quotation marks omitted). So long as the agency "explain[s] the evidence which is

available, and . . . offer[s] a rational connection between the facts found and the choice made," a

court will not invalidate an agency rule. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52 (citation and

internal quotation marks omitted).

An agency abuses its discretion in promulgating a rule "if there is no evidence to support

the decision or if the decision was based on an improper understanding of the law." *Statewide*

*Bonding, Inc. v. DHS*, No. 19-cv-2083, 2019 WL 6329390, at *2 (D.D.C. Nov. 26, 2019)

(citations and internal quotation marks omitted). "Put another way, the court's role is only to

consider whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment." *Id.* (citations and internal quotation marks omitted).

Finally, in assessing constitutional challenges brought under the APA, a court does not

defer to the agency's pronouncement on constitutional issues; instead, it "make[s] 'an

independent assessment of a citizen's claim of constitutional right.'" *Poett v. United States*, 657

F. Supp. 2d 230, 241 (D.D.C. 2009) (quoting *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1173–74

(D.C. Cir. 1980)).

## II.   COUNTS ONE AND TWO: THE SPENDING CLAUSE AND THE TENTH AMENDMENT

Plaintiffs argue that the Smoke Free Rule violates the anticommandeering principle of the

Tenth Amendment and exceeds Congress' Spending Clause power because the Rule

impermissibly coerces or commandeers the States into complying with the federal regulation.[6] (Pls.' Mem. at 14–21.)

The Spending Clause gives Congress the power to "provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Pursuant to this grant, Congress may offer funding to the States on the condition that they comply with certain terms that are designed to ensure that the funds are, in fact, used as Congress intended. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 537, 576 (2012) (plurality opinion). Such offers are legitimate even if they "induce the States to adopt policies that the Federal Government itself could not impose" or "tak[e] certain actions that Congress could not require them to take." *Id.* (citation and internal quotation marks omitted); *see also South Dakota v. Dole*, 483 U.S. 206, 207 (1987) ("[O]bjectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." (citation and internal quotation marks omitted)).

Despite the breadth of Congress' power under the Spending Clause, its exercise must conform to four general restrictions: First, it "must be in pursuit of the general welfare"; second, any condition on the receipt of federal funds must be unambiguous; third, it must be "related to the federal interest in particular national projects or programs"; and fourth, it must not violate other constitutional provisions, such as the Tenth Amendment, that "provide an independent bar to the conditional grant of federal funds." *Dole*, 483 U.S. at 207–08 (citations and internal quotation marks omitted). Plaintiffs do not dispute that the Smoke Free Rule was promulgated in

---

[6] Much of plaintiffs' Tenth Amendment argument is tied to their claim that Congress has not authorized HUD to implement the Smoke Free Rule. (*See, e.g.*, Pls.' Opp. at 11 ("Congress has never attempted to legislate a smoking ban, let alone provide HUD the authority to do so without authorizing legislation.").) This claim is addressed *infra* at Section VII.

furtherance of the general welfare. Accordingly, the Court's analysis focuses on the latter three restrictions.

### A. The Smoke Free Rule sets forth its conditions unambiguously.

If an exercise of the Spending Clause contains any conditions on the receipt of federal funds, "it must do so unambiguously" so that the States may "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (citation and internal quotation marks omitted); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'"). In essence, a State must be aware of the conditions and be able to ascertain what is expected of it. *See Pennhurst State Sch. Hosp.*, 451 U.S. at 17. Plaintiffs argue that the Smoke Free Rule does not meet this requirement because HUD "fails to inform PHAs . . . what they risk losing if they choose not to comply." (Pls.' Opp. at 12.) But, as defendants note, the consequences of noncompliance with applicable HUD regulations are clearly expressed in HUD's contracts with the PHAs. Those contracts provide that when a PHA substantially defaults—or commits "a serious and material violation of any one or more of the covenants contained in [the contract]"—HUD has a right to take title to the housing project or projects, take possession of them, terminate the contract, or seek other remedies available under applicable law.[7] Form HUD-53012A § 17(B), (E), (F), (H). Because HUD's regulations—including the Smoke Free Rule—are incorporated into the HUD/PHA contract, *id.* § 5, the conditions placed on receipt of federal funding by the Smoke

---

[7] Also, the statute explicitly grants HUD the right to claim title or take possession of a project in the event of a substantial default. *See* 42 U.S.C. § 1437d(g)(1).

Free Rule are unambiguous.[8]  *See also* 42 U.S.C. § 1437d(f)(1) (stating that each contract for federal funding must require that the PHA maintain its public housing in compliance with the housing quality standards promulgated by HUD).

### B.  The Smoke Free Rule is sufficiently related to the purpose of federal housing funding.

Plaintiffs contend that the Smoke Free Rule is not sufficiently related to the purpose of the federal housing funding.  (Pls.' Opp. at 10–12.)  To support this argument, plaintiffs seek to distinguish *South Dakota v. Dole*, 483 U.S. 206 (1987), where the Supreme Court upheld a federal statute conditioning a State's receipt of a portion of federal highway funds on the adoption of a minimum drinking age of 21.  Plaintiffs maintain that setting a minimum drinking age of 21 is sufficiently related to the purpose of the federal funding in *Dole*—safe interstate travel—because "[d]rinking and driving is undeniably linked to auto accidents causing injury and death."  (Pls.' Opp. at 11.)  They argue that, in contrast, HUD "utterly fails" to demonstrate how the Smoke Free Rule "bears a *bona fide* connection to" the Housing Act.  (*Id.*)  Plaintiffs' argument is unpersuasive.

To be legitimate, a condition on the receipt of federal funds need not be "undeniably linked" to the funding's purpose; it need only "'bear some relationship' to the purpose of the

_____

[8] Plaintiffs do not dispute HUD's rights under the contracts or that the contracts will govern if a PHA fails to comply with the Rule.  Instead, they argue that the Smoke Free Rule gives HUD "*total discretion*" to determine the consequences of noncompliance (Pls.' Opp. at 17), and they point to the final rule, which states, "If HUD determines that a PHA is not in compliance with its plan, HUD will take whatever action it deems necessary and appropriate."  81 Fed. Reg. 87,437. But the fact that HUD has not identified the precise contractual remedy it would select in a case of noncompliance does not mean that PHAs are "simply left clueless as to what they stand to lose."  (Pls.' Opp. at 17.)  PHAs are aware of the limited options available to HUD if they do not comply with the Rule.

spending." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004)[9]

(quoting *New York v. United States*, 505 U.S. 144, 167 (1992)); *see also Am. Civil Liberties*

*Union v. Mineta*, 319 F. Supp. 2d 69, 80 (D.D.C. 2004) ("[T]he connection between the funding

restriction and the purpose of the funding does not have to be particularly closely related to

withstand a challenge.").  Here, the Rule was designed "to improve indoor air quality . . . ;

benefit the health of public housing residents, visitors, and PHA staff; reduce the risk of

catastrophic fires; and lower overall maintenance costs." 81 Fed. Reg. 87,431.  The evidence

HUD relied upon in promulgating the Rule corroborates the relationship between the condition

on the receipt of the funding and the purpose of the funding.  (*See, e.g.*, AR 2450 (study

concluding that secondhand smoke transfers between units in the same building and "the most

effective way to ensure that residents of [those] units are not exposed to [secondhand smoke]" is

to ban smoking in the building); AR 2460–61 (study discussing negative health effects of

secondhand smoke on children, determining that children who live in multiunit buildings are

exposed to significantly more secondhand smoke, and recommending that those buildings ban

smoking); AR 4823 (study concluding that indoor air quality in public housing buildings where

smoking is permitted is lower than that in buildings that prohibit smoking and recommending

that buildings institute smoke-free policies); AR 5958 (Surgeon General's conclusions on health

risks associated with exposure to secondhand smoke); AR 9869 (HUD's regulatory impact

analysis concluding that the Rule will reduce costs for PHAs by $16 million to $38 million per

year and the reduction in cost from fire damage is estimated to be $4.7 million).  Because the

Rule promotes safer and healthier housing for low-income families—a stated goal of 42 U.S.C.

---

[9] Indeed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour*, 374 F.3d at 1168.

§ 1437—the Court concludes that the Smoke Free Rule directly relates to the purpose of the public housing funding. *See Good v. U.S. Dep't of Hous. & Urban Dev.*, No. 3:18-CV-516, 2019 WL 6839320, at *5 (N.D. Ind. Dec. 12, 2019) ("[T]he condition that PHAs implement no smoking policies directly relates to the purpose of the funding.").

### C. The Smoke Free Rule does not violate the Tenth Amendment.

Asserting that the Rule "gives the States . . . no option but to follow the federal directives" (Pls.' Mem. at 18), plaintiffs argue that the Smoke Free Rule violates the anticommandeering principle of the Tenth Amendment, which prohibits (1) "federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes" and (2) legislation that "us[es] financial inducements to exert a power akin to undue influence." *NFIB*, 567 U.S. at 577 (plurality opinion) (citation and internal quotation marks omitted). This argument is unpersuasive.

Plaintiffs' argument that the Rule violates the first prohibition because it "affirmatively commands state and local agencies to implement federal policies" (Pls.' Opp. at 15) ignores the fact that, unlike the cases invalidating legislation on this ground, States are given a *choice* whether to accept the federal public housing funding and the terms attached to it. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475–81 (2018) (striking down a federal law prohibiting state legislative authorization of sports gambling); *Printz v. United States*, 521 U.S. 898, 933 (1997) (invalidating a federal law that imposed a mandatory obligation on state law enforcement agents "to perform background checks on prospective handgun purchasers"); *New York*, 505 U.S. at 175–76 (striking down a federal law requiring States to either "take title" to radioactive waste or "regulat[e] according to the instructions of Congress"). If a State chooses

not to accept the federal government's public housing funding, it is not required to comply with the Smoke Free Rule.

Plaintiffs argue that HUD's conditioning of federal funding on PHAs' adoption of the Smoke Free Rule violates the Tenth Amendment's second prohibition because it is an impermissible "overlay onto existing funding." (Pls.' Opp. at 17.) Specifically, plaintiffs contend that the government cannot impose a new condition, *i.e.*, compliance with the Smoke Free Rule, on the continued receipt of all pre-existing federal housing funding. (*Id.*; *see also* Pls.' Mem. at 21.) The Supreme Court has ruled otherwise, stating that such "adjustments" to a pre-existing program may be conditioned on both old and new funding if the State has agreed to future alterations and amendments. *NFIB*, 567 U.S. at 583 (plurality opinion). The Court noted that Congress had done so with the Medicare program through the Omnibus Budget Reconciliation Act of 1990, which extended Medicare eligibility and conditioned compliance on both old and new funding. *Id.* In this case, PHAs agreed in their contracts with HUD to future amendments to the regulations. *See* Form HUD-53012A § 5. Accordingly, HUD's conditioning of public housing funding on compliance with the Smoke Free Rule is permissible and does not contravene the teaching of *NFIB*.[10]

---

[10] To the extent plaintiffs argue that a PHA's risk of losing all of its public housing funding is "so coercive as to pass the point at which pressure turns into compulsion," *NFIB*, 567 U.S. at 580 (plurality opinion) (citation and internal quotation marks omitted), the Court has no information to assess the merits of this claim. Plaintiffs merely state that a State's decision to not comply with the Rule "might end up costing them significant funding." (Pls.' Opp. at 17.) Since they provide no specifics about the relationship between federal funds received for public housing and a State's public housing budget or a State's overall budget, they have not met their burden of establishing that the Smoke Free Rule violates the Tenth Amendment. *Mississippi Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 178 (D.C. Cir. 2015) (per curiam) ("[T]he burden of establishing unconstitutionality is on the challenger. . . .").

Because the Smoke Free Rule is a permissible exercise of the Spending Clause and does not commandeer the States in violation of the Tenth Amendment, the Court will grant defendants' motion for summary judgment as to Counts One and Two.[11]

## III. COUNTS THREE AND FOUR: THE FOURTH AMENDMENT

Plaintiffs challenge the Smoke Free Rule on the ground that it violates their right to be free in their homes from unreasonable searches and seizures under the Fourth Amendment. (Pls.' Mem. at 25–30; *see also* Compl. ¶¶ 70–87, ECF No. 1.) Plaintiffs claim that, "[i]n order to ensure compliance [with the Rule], PHAs will need to violate the Fourth Amendment rights of tenants, because the prohibited activity will be occurring in the privacy of the tenants' units." (Pls.' Mem. at 29.) Plaintiffs' facial challenge to the Rule is thus premised on their assumption that the Rule authorizes and/or requires PHAs to unlawfully enter tenants' homes.

### A. Plaintiffs have standing to assert their Fourth Amendment claim.

As a threshold matter, defendants argue that plaintiffs lack standing because they fail to show an injury in fact to their Fourth Amendment rights, and any injury would not be fairly traceable to HUD's conduct but would be caused by the independent actions of the PHAs. (Defs.' Mot at 25–29.) Plaintiffs counter that, because they have standing to challenge the Rule on other grounds, they may also challenge the Rule under the Fourth Amendment or, in the alternative, that they have suffered an injury in fact and that plaintiffs' injuries are traceable to

---

[11] With regard to their Tenth Amendment claims, plaintiffs also argue that the Smoke Free Rule does not preempt state law. Neither party cites to any state law that presents a conflict with the Rule. Indeed, plaintiffs admit that "there is no conflict to be examined between the federal Smoking Ban and the state PHA policies that the Ban directs the state agencies to implement." (Pls.' Mem. at 23.) Because a ruling on this issue would "offer nothing more than an advisory opinion on potentially difficult questions of federalism and constitutional law," *Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010), the Court will not address the preemption argument. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).

HUD's adoption of the Smoke Free Rule, which requires the compliance of federally funded PHAs. (Pls.' Opp. at 4–7.) Focusing only on plaintiffs' latter argument, the Court concludes that plaintiffs have suffered an injury that is traceable to HUD's conduct.

As the party invoking federal jurisdiction, plaintiffs have the burden of establishing that they have standing by showing that (1) they suffered an injury in fact, (2) the injury is "fairly traceable" to the defendant's conduct, and (3) it is likely redressable by a judicial decision in their favor. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). Because the plaintiffs are public-housing tenants who smoke and a smokers' advocacy group made up of members who live in public housing, plaintiffs are injured by the Rule because it bars them from smoking.[12] That injury is fairly traceable to HUD's conduct because it was caused by HUD's promulgating the Rule. Finally, their injuries would likely be redressed by the relief sought—a judgment vacating or modifying the Rule to allow public housing tenants to smoke in their private units. *See Bennett v. Donovan*, 703 F.3d 582, 586–90 (D.C. Cir. 2013) (appellants had standing to challenge a HUD regulation applying to third-party lenders because a decision in appellants' favor would *likely* redress their injury, even though relief was not certain). Because plaintiffs have shown that they are injured by the Rule and that their injury was caused by defendants, they need not show more to bring their Fourth Amendment claim.

---

[12] Defendants' argument to the contrary focuses on the likelihood that plaintiffs will be subject to an unlawful search in the future. (Defs.' Mot. at 26–28.) However, the cases defendants cite for the proposition that plaintiffs must show a substantial likelihood of harm in the future are cases in which the plaintiffs had no actual, present injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013) (plaintiffs' injury rested on the *likelihood* that the challenged statute would be applied to them but had no evidence that it had been or would be); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983) (*threat* that police policy of using chokeholds was insufficient to support standing). Unlike these cases, plaintiffs here are currently suffering an actual injury by being barred from smoking.

## B. Plaintiffs fail to bring a cognizable Fourth Amendment facial challenge.

To succeed on a facial challenge, "a plaintiff must establish that a law is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) (citation and internal quotation marks omitted). Where a facial challenge to a statute is made on the ground that it authorizes searches in violation of the Fourth Amendment, "the proper focus of the constitutional inquiry is searches that the law *actually authorizes* . . . ." *Id.* (emphasis added). Thus, the issue before the Court is whether the Rule authorizes unlawful searches. *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 574, 576 (1980) (invalidating "New York statutes that authorize police officers to enter a private residence without a warrant").

Here, the Smoke Free Rule does not authorize any type of unlawful search. It does not, for instance, state that public housing tenants are required to submit to searches of their unit or provide that, to enforce the Rule, PHAs may enter tenants' units without consent, a warrant, or some other lawful basis for entry.[13] Instead, as plaintiffs note, HUD does not provide any "specific enforcement mechanisms" for the Smoke Free Rule (Pls.' Mem. at 29), for, as explained in the final rule, "lease enforcement policies are typically at the discretion of PHAs, and it is appropriate for local agencies to ensure fairness and consistency with other policies." 81 Fed. Reg. 87,437. Significantly, HUD's guidance regarding lease provisions governing PHA entry into a tenant's unit expressly states that its regulations "do[] not authorize PHAs or police departments to enter units for security purposes unless the police department has a search warrant or they are in hot pursuit of a suspect who has run into the unit," and that "[t]enants

---

[13] In fact, plaintiff Douglas Soncksen was found to be in violation of the terms of his lease because he was observed smoking outside on his porch, but he was given a "free pass" for his first violation. (Soncksen Decl. Ex. B, at 1, ECF No. 26-5.)

cannot be asked to waive their Fourth Amendment rights." U.S. Dep't of Hous. & Urban Dev.,
Public Housing Occupancy Guidebook at 200 (2003).

Because the Rule simply prohibits public housing tenants from smoking in their
apartments, and it does not authorize any unlawful searches, plaintiffs' Fourth Amendment facial
challenge to the Rule is not cognizable, and defendants are entitled to summary judgment on
Counts Three and Four.

## IV.    COUNTS FIVE AND SIX: SUBSTANTIVE DUE PROCESS

In Counts Five and Six, plaintiffs argue that the Smoke Free Rule violates the Due
Process Clause of the Fifth Amendment because it interferes with their fundamental right to
engage in legal activity in the privacy of their homes, and the Rule is not tailored to serve a
compelling government interest. (Pls.' Opp. at 27–35.)

Under the Due Process Clause, "[n]o person shall be . . . deprived of life, liberty, or
property, without due process of law." U.S. Const. amend. V. This clause "provides heightened
protection against government interference with certain fundamental rights and liberty interests."
*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Laws that burden fundamental rights are
upheld only if the law is "narrowly tailored to serve a compelling state interest," *Reno v. Flores*,
507 U.S. 292, 302 (1993), while laws that do not are only required to bear some rational relation
to a legitimate governmental purpose. *Heller v. Doe*, 509 U.S. 312, 319–20 (1993). Thus, the
Court must first consider whether the right asserted by plaintiffs is a fundamental right. *See
Reno*, 507 U.S. at 302 ("Substantive due process analysis must begin with a careful description
of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost
care whenever we are asked to break new ground in this field." (citation, alteration, and internal
quotation marks omitted)).

16

Plaintiffs insist that they are not asserting a fundamental right to smoke or to use tobacco products. (*See* Pls.' Opp. at 27.) Instead, they claim that they have "a fundamental right . . . to engage in legal activities within the privacy of their own homes." (Pls.' Opp. at 28.) Neither the Supreme Court nor any other federal court has recognized such an expansive fundamental right. Indeed, the Supreme Court has limited its recognition of fundamental rights to "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, . . . to abortion," *Glucksberg*, 521 U.S. at 720 (citations omitted), and to engage in private sexual activity, *see Lawrence v. Texas*, 539 U.S. 558, 578 (2003). To the extent these rights relate to the home, fundamental rights only "encompass[] and protect[] the *personal intimacies* of the home," not everything that occurs within it. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (1973) (emphasis added); *see also Paul P. v. Verniero*, 170 F.3d 396, 399 (3d Cir. 1999) ("Th[e] 'guarantee of personal privacy' covers 'only personal rights that can be deemed fundamental or implicit in the concept of ordered liberty.'" (quoting *Roe v. Wade*, 410 U.S. 113, 152 (1973)); *Operation Badlaw, Inc. v. Licking Cty. Gen. Health Dist. Bd. of Health*, 866 F. Supp. 1059, 1067 (S.D. Ohio 1992) (finding no cases "extending the right to privacy as far as the right to smoke either in public or in private"), *aff'd*, 991 F.2d 796 (6th Cir. 1993). The Supreme Court has warned against expanding these rights "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended" and because doing so "place[s] the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720 (citation and internal quotation marks omitted).

Plaintiffs rely on four Supreme Court cases to support their argument that "adults effectively have a fundamental right . . . to engage in legal activities within the privacy of their

own homes." (Pls.' Opp. at 28.)  These cases do not support their argument.  First, in *Stanley v. Georgia*, the defendant was convicted of possession of obscene material in violation of Georgia law based on the discovery of obscene material in his home.  394 U.S. 557, 558–59 (1969).  On appeal, the defendant challenged the constitutionality of the Georgia statute on the ground that it violated the First Amendment, as applied to the States through the Fourteenth, by punishing private possession of obscene material.  *Id.* at 559.  The Supreme Court agreed and held that the First Amendment's protection of the "right to receive information and ideas, regardless of their social worth," prohibits making mere possession of obscene material in the home a crime.  *Id.* at 559, 564.  In two subsequent cases cited by plaintiffs, *United States v. Orito* and *Paris Adult Theatre I v. Slaton*, the Court approved two federal laws regulating obscene material outside of the home—one preventing obscene material from entering the stream of commerce, *see Orito*, 413 U.S. 139, 143 (1973), and one prohibiting exhibition of obscene films in public theaters.  *See Paris Adult Theatre I*, 413 U.S. at 69–70.  In both, the Court held that First Amendment right expounded in *Stanley* did not extend beyond the home.  *See Orito*, 413 U.S. at 141–42; *Paris Adult Theatre I*, 413 U.S. at 66–67.  Finally, in *Lawrence v. Texas*, two male defendants were convicted of "deviate sexual intercourse" in violation of Texas law.  539 U.S. at 563.  The Court overturned their convictions, holding that the Due Process Clause of the Fourteenth Amendment protected private sexual behavior.  *Id.* at 578–79.

Unlike these cases, plaintiffs' claims are not rooted in the First Amendment nor in the fundamental right to engage in private sexual behavior.  Nor can these cases be read to extend the implied right to privacy to all legal conduct within one's home.  Indeed, the Court in *Stanley* made clear that its holding "turn[ed] upon . . . fundamental liberties protected by *the First and Fourteenth Amendments*."  394 at 568 n.11 (emphasis added).  *Orito* and *Paris Adult Theatre I*

did no more than affirm the holding in *Stanley*. Finally, the right recognized in *Lawrence* only extended substantive due process protection to private sexual behavior, not all private conduct. *See* 539 U.S. at 578 ("The[] right to liberty under the Due Process Clause gives [petitioners] the full right to engage in their conduct without intervention of the government."). Given the Supreme Court's caution against expanding substantive due process rights, *Glucksberg*, 521 U.S. at 720, the Court declines plaintiffs' invitation to recognize a new fundamental right to conduct *all* legal activity in the home. *See Hutchins v. District of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999) (refusing to recognize a general right to free movement based on the right to *interstate* travel).

Plaintiffs also rely on *Ravin v. State*, where the Alaska Supreme Court held that possession of marijuana in the home for personal use is constitutionally protected. (Pls.' Mem. at 32 (citing 537 P.2d 494 (Alaska 1975).) Plaintiffs' reliance on this case is misplaced for two reasons. First, the court's ruling was based on the Alaska Constitution, which, unlike the U.S. Constitution, contains an explicit right to privacy. *Ravin*, 537 P.2d at 504 ("Thus, we conclude that citizens of the State of Alaska have a basic constitutional right to privacy in their homes under Alaska's constitution. This right to privacy would encompass the possession and ingestion of substances such as marijuana in a purely personal, non-commercial context in the home . . . ."). Second, the Supreme Court of Alaska did not utilize the federal substantive due process test in reaching its conclusion. Instead, the Alaska court first looked to whether the regulation at issue infringed the claimant's rights and, then, whether the infringement was justified. *See id.* at 498. Thus, the court did not determine whether a fundamental right was at issue. Moreover, the court admitted that if it had "utilize[d] the fundamental right-compelling state interest test in resolving privacy issues under [the privacy amendment] of Alaska's

constitution, [the court] would conclude that there is not a fundamental constitutional right to possess or ingest marijuana in Alaska." *Id.* at 502. *Ravin* is thus inapplicable.

There are, however, two federal cases that are on point, both of which hold that the Smoke Free Rule does not implicate a fundamental right. *See Good*, 2019 WL 6839320, at *4–5 ("Courts have repeatedly held that smoking is not a fundamental right, entitling special protection under either a right to privacy or substantive due process analysis."); *Telepo v. Ferguson*, No. 17-cv-2865, 2018 U.S. Dist. LEXIS 231893, at *2 n.3 (E.D. Pa. Jan. 3, 2018) ("Telepo has not shown that smoking in the privacy of a public housing unit is a fundamental right. Courts have repeatedly held that smoking, inside or outside of a home environment, is not a fundamental right, entitling special protection under either a right to privacy or substantive due process analysis."). Plaintiffs attempt to distinguish these two cases by arguing that *Good* and *Telepo* concern the right to *smoke* in private, whereas plaintiffs assert a more general fundamental right to *engage in lawful conduct* in the home. (*See* Pls.' Resp. to Defs.' Notice of Suppl. Authority at 4, ECF No. 44.) However, plaintiffs' distinction is one without a difference, for if their right to engage in legal conduct in the home was indeed fundamental, they would necessarily have a fundamental right to smoke in the privacy of their homes. And, these two cases are not as limited as plaintiffs suggest, since they both concluded that smoking in one's home is not protected by a right to privacy.

Because no fundamental right is implicated by the Smoke Free Rule, it is not subject to heightened scrutiny, and plaintiffs need only "prove that the government's restrictions bear no rational relationship to a legitimate state interest." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007). "The challenged policy 'need not be in every respect logically consistent with its aims to be constitutional.'" *Id.*

(quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955)).  Indeed, courts afford challenged policies "a strong presumption of validity."  *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1156 (D.C. Cir. 2004).  Moreover, where a defendant provides multiple reasons for a challenged action, a court only needs to find that one reason is rationally related to a legitimate state interest for the action to survive.  *Id.*

Creating safe housing conditions and remedying the shortage of safe homes for low-income families—the purpose behind the Housing Act—are legitimate governmental interests.  *See 2910 Ga. Ave. LLC v. District of Columbia*, 234 F. Supp. 3d 281, 312 (D.D.C. 2017) (holding that the government's "affordable housing goals constitute a legitimate state interest"); *Disney v. Knoxville's Comm. Dev. Corp.*, 508 F. Supp. 68, 71 (E.D. Tenn. 1980) (stating that the government's interest in "providing adequate housing for families of low incomes" is legitimate).  The Smoke Free Rule reasonably advances these goals by "improv[ing] indoor air quality in the housing; benefit[ing] the health of public housing residents, visitors, and PHA staff; reduc[ing] the risk of catastrophic fires; and lower[ing] overall maintenance costs."  81 Fed. Reg. 87,430; *see also Beatie v. City of New York*, 123 F.3d 707, 713 (2d Cir. 1997) (restrictions on cigar smoking are rationally related to the legitimate government interest of protecting the health of nonsmokers); *Good*, 2019 WL 6839320, at *5 (the Smoke Free Rule "is rationally related to the government's interest in preventing individuals from being exposed to secondhand smoke"); *Telepo*, 2018 U.S. Dist. LEXIS 231893, at *2 n.3 (the Smoke Free Rule serves legitimate government interests, "include[ing] improving the health of both smokers and those exposed to secondhand smoke, reducing fire hazards, maintaining clean and sanitary conditions, and reducing complaints and the threat of litigation from those who do not smoke"); *Giordano v. Conn. Valley Hosp.*, 588 F. Supp. 2d 306, 314 (D. Conn. 2008) (smoking

restrictions are reasonably related to legitimate state interests of reducing fires, improving the

health and safety of those affected, promoting clean and sanitary conditions, and reducing

complaints from nonsmokers); *Thiel v. Nelson*, 422 F. Supp. 2d 1024, 1030 (W.D. Wis. 2006)

(same).[14] Thus, the Rule does not violate the Fifth Amendment, and the Court will grant

summary judgment on Counts Five and Six to defendants.

## V.  COUNT SEVEN: THE UNCONSTITUTIONAL CONDITIONS DOCTRINE

Plaintiffs allege in Count Seven that the Smoke Free Rule violates the unconstitutional

conditions doctrine because it "conditions tenants' receipt of the benefit of public housing on

giving up their Fourth Amendment rights."  (Pls.' Mem. at 36; *see also* Compl. ¶¶ 220–25.)

Under that doctrine, "the government may not require a person to give up a constitutional

right . . . in exchange for a discretionary benefit conferred by the government." *Dolan v. City of*

---

[14] Plaintiffs also argue that any risk posed by secondhand smoke to the health of nonsmokers
does not create a compelling state interest that would support the Smoke Free Rule.  (Pls.' Opp.
at 29–30.)  This is the wrong legal standard, since the Rule is not subject to strict scrutiny.  In
addition, their argument is not supported by the cases they cite.  The state court cases cited by
plaintiffs are tort actions brought by nonsmoker-plaintiffs against neighbors who smoke for
secondhand smoke transfer in multiunit buildings.  *See Feinstein v. Rickman*, 136 A.D.3d 863,
864 (N.Y. App. Div. 2016); *Schuman v. Greenbelt Homes, Inc.*, 69 A.3d 512, 514 (Md. Ct. Spec.
App. 2013); *Ewen v. Maccherone*, 927 N.Y.S.2d 274, 275 (N.Y. App. Div. 2011).  The courts
declined to impose tort liability for secondhand smoke, but the courts did not address the health
risk associated with secondhand smoke or the government's ability to regulate smoking.  In fact,
two of those cases acknowledged "the significant health hazards to nonsmokers inherent in
exposure to secondhand smoke." *Ewen*, 927 N.Y.S.2d at 277; *see also Schuman*, 69 A.3d at 520
("We do understand that although the true effects of secondhand smoke are still being assessed,
it obviously can be harmful.").

The two federal cases relied upon by plaintiffs are similarly unhelpful.  First, the Supreme
Court decision in *Helling v. McKinney*, 509 U.S. 25 (1993), held that the defendant "state[d] a
cause of action under the Eighth Amendment by alleging that [prison officials] have, with
deliberate indifference, exposed him to levels of [secondhand smoke] that pose an unreasonable
risk of serious damage to his future health." *Id.* at 35.  Second, the D.C. Circuit decision in *Scott
v. District of Columbia*, 139 F.3d 940 (D.C. Cir. 1998), turned on plaintiffs' failure to present
sufficient evidence as to the level of their exposure to secondhand smoke. *Id.* at 943.  Thus,
contrary to plaintiffs' assertion, neither court concluded that secondhand smoke does not create a
"substantial risk" to nonsmokers.

*Tigard*, 512 U.S. 374, 385 (1994).  As previously discussed, enforcement of the Smoke Free Rule does not require PHAs to violate plaintiffs' Fourth Amendment rights.  *See supra* Section III.B; *see also* U.S. Dep't of Hous. & Urban Dev., Public Housing Occupancy Guidebook at 200 (2003) ("Tenants cannot be asked to waive their Fourth Amendment rights.").  Thus, the Rule does not "require a person to give up a constitutional right . . . in exchange for a discretionary benefit," *Dolan*, 512 U.S. at 385, and defendants are entitled to summary judgment on Count Seven.

## VI.    COUNTS EIGHT AND NINE: THE COMMERCE CLAUSE

Counts Eight and Nine allege that the Smoke Free Rule is an impermissible exercise of Congress' power under the Commerce Clause.  (Compl. ¶¶ 226–39.)  Specifically, plaintiffs argue that use of tobacco in a private home does not substantially affect interstate commerce and the power to regulate that use belongs exclusively to the States.  (*See* Pls.' Mem. at 37–42; *see also* Compl. ¶¶ 229–32, 236–39.)   Because the Court has concluded that the promulgation of the Smoke Free Rule is a valid exercise of Congress' spending power, *see supra* Section II, the Court does not need to decide whether it is also legitimate under the Commerce Clause.  *See Benning v. Georgia*, 391 F.3d 1299, 1304 (11th Cir. 2004) ("Although [plaintiffs] argue that Congress acted within its authority under both the Spending Clause and the Commerce Clause, we need not address both arguments so long as Congress validly exercised either source of authority."); *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003) ("Whether or not the Commerce Clause provides an independent *justification* for RLUIPA does not impact its constitutionality under the Spending Clause." (emphasis in original)).  Accordingly, defendants are entitled to summary judgment on Counts Eight and Nine.

## VII.  COUNTS TEN, ELEVEN, AND TWELVE: HUD'S AUTHORITY TO PROMULGATE THE SMOKE FREE RULE

In Counts Ten, Eleven, and Twelve, plaintiffs allege that Congress did not authorize HUD to promulgate the Smoke Free Rule.  (*See* Compl. ¶¶ 240–53.)  They argue that "[n]either HUD's organic statute nor any other statute gives HUD the authority or jurisdiction to regulate emissions of smoke due to use of tobacco products in private living quarters" "or anywhere else," or "to regulate indoor air quality on a nationwide basis."  (Pls.' Mem. at 43, 45–46.)

Plaintiffs' argument is flawed for two reasons.  First, it assumes that Congress must expressly delegate the power to regulate certain fields.  Longstanding Supreme Court precedent recognizes that congressional delegation to an agency may be implicit.  *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.").  Second, plaintiffs mischaracterize the authority that HUD purports to exercise.  The issue before the Court is not whether HUD has the authority to regulate use of tobacco products or indoor air quality generally, but whether HUD has the much narrower power to ban the use of certain tobacco products in public housing pursuant to 42 U.S.C. § 1437d(f)(2).  (*See* Defs.' Mot. at 37–38.)  This issue is governed by *Chevron*.  *See City of Arlington v. FCC*, 569 U.S. 290, 296–97 (2013) (a court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority); *Verizon v. FCC*, 740 F.3d 623, 635 (D.C. Cir. 2014) (applying *Chevron* "to determine whether the Commission has demonstrated that the regulations fall within the scope of its statutory grant of authority").  And, as *Chevron* makes clear, agencies are generally entitled to deference in the interpretation of statutes that they administer, but the

agency must give effect to the unambiguously expressed intent of Congress.  *See* 467 U.S. at 842–44.

Section 1437d(f)(2) commands HUD to "establish housing quality standards . . . that ensure that public housing dwelling units are safe and habitable."  The statute leaves to HUD the task of developing those standards, instructing that they "shall include requirements relating to habitability, including maintenance, health and sanitation factors, condition, and construction of dwellings."  *Id.*  Thus, § 1437d(f)(2) requires HUD "to make interpretive choices for statutory implementation" in filling the gaps in the public housing statute.  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 56 (2011).

Those interpretive choices must still represent "a reasonable interpretation of the enacted text."  *Id.* at 58 (citation and internal quotation marks omitted).  Plaintiffs do not argue that HUD's construction of the statute is unreasonable, nor can the Court conclude that a regulation aimed at "improv[ing] indoor air quality in the housing; benefit[ing] the health of public housing residents, visitors, and PHA staff; reduc[ing] the risk of catastrophic fires; and lower[ing] overall maintenance costs" is an unreasonable implementation of the power to "establish housing quality standards . . . that ensure that public housing dwelling units are safe and habitable."

In sum, the Smoke Free Rule does not regulate the use of tobacco products as a drug or indoor air quality.  It simply prohibits the use of certain tobacco products in designated indoor and outdoor spaces in HUD-financed public housing as part of HUD's expressly delegated authority to regulate the safety, habitability, health, and sanitation of public housing.  Therefore, the Court will defer to HUD's interpretation of its authority and will grant summary judgment to defendants on Counts Ten, Eleven, and Twelve.

## VIII.  COUNT THIRTEEN: VIOLATION OF THE APA

Count Thirteen includes several challenges to the Smoke Free Rule on the ground that it is "arbitrary, capricious, and an abuse of discretion" in violation of § 706(2)(A) of the APA. (Compl. ¶ 256.)  Two of those challenges rehash arguments previously raised regarding HUD's authority to promulgate the Rule and plaintiffs' right to engage in legal activities in the privacy of their homes.  (Pls.' Mem. at 50–51.)  These arguments have already been rejected by the Court.

Plaintiffs also argue that, by banning smoking within twenty-five feet of public housing, the Smoke Free Rule "poses a substantial risk of harm to public housing tenants by forcing them to leave the safety of their homes and venture out into dangerous public areas, in all kinds of harsh weather conditions."  (*Id.* at 51.)  Plaintiffs claim that the Rule especially burdens and endangers women, the elderly, and disabled persons.  (*Id.* at 52.)  HUD considered this issue extensively in promulgating the Rule and recommended various ways PHAs could alleviate the burden for such tenants.  *See* 81 Fed. Reg. 87,434.  For example, HUD recommended that PHAs consider moving especially burdened tenants to first-floor units, "which would provide easier access to smoking outside of their units," and that PHAs modify walkways for easier use by affected residents.  *Id.*  It also noted that all residents have the option of using in their private units electronic nicotine delivery systems, which are not banned by the Smoke Free Rule.  *Id.*[15]

---

[15] In their opposition and reply, plaintiffs attempt to broaden their arbitrary and capricious claim by raising new arguments not pled in their complaint or raised in their summary judgment motion.  (*See, e.g.*, Pls.' Opp. at 43 (arguing that "HUD's ambiguous and vague enforcement posture creates unnecessary uncertainty for both PHAs and PHA tenants"); *id.* at 43–46 (arguing that the Smoke Free Rule "disparately discriminates based on handicap, age, and race"); *id.* at 46–49 (arguing that "HUD's stated rationales for the [Rule] are pretextual").  Because plaintiffs may not amend their complaint through their summary judgment briefing, the Court will not consider these arguments. *Wilson v. DNC Servs. Corp.*, No. 1:17-cv-00730, 2019 WL 4737603, at *8 (D.D.C. Sept. 27, 2019); *Bean v. Perdue*, 316 F. Supp. 3d 220, 226 (D.D.C. 2018).

Plaintiffs also contend that the Rule is arbitrary and capricious because it does not further the stated goal of improving indoor air quality. (Pls.' Mem. at 50.) According to plaintiffs, the Rule does not do so because it "is predicated on the scientifically dubious notion that the tobacco product emissions produced by public housing tenants using tobacco products within their private living quarters pose a health risk to tenants living in other apartments." (*Id.*) Plaintiffs base their argument on two studies in the record that used mechanical devices to measure the transfer of secondhand smoke between dwelling units. (Pls.' Opp at 41.) Plaintiffs characterize these studies as "weak[] in . . . data and method" because both admitted that $PM_{2.5}$, a particulate environmental marker for secondhand smoke, may be emitted by combustible materials other than tobacco smoke. (*Id.*)

Plaintiffs' argument is flawed. First, plaintiffs do not dispute that the Rule would effectuate its other stated purposes of reducing the risk of fires and lowering maintenance costs. Second, plaintiffs mischaracterize the two studies that they criticize. Although the first admitted that $PM_{2.5}$ is "emitted from many combustible materials and thus not specific to tobacco smoke," the study later stated that "cigarette smoke has previously been shown to serve as a major source of $PM_{2.5}$." (AR 2456.) Also, the study found that "individuals who reside in close proximity to one another in [multiunit housing] are especially vulnerable to compromised air quality from [secondhand smoke] incursions originating in units where smoking is permitted" (*id.*), and that "the implementation of a smoke-free building policy represents the most effective way to ensure that residents of [multiunit housing] units are not exposed to [secondhand smoke]." (AR 2450.) As to the second study, plaintiffs point out that it, like the first study, recognized that "$PM_{2.5}$ itself is not specific to secondhand smoke." (AR 2777.) Nonetheless, the study found that "households with self-imposed smoke-free policies in smoking-permitted buildings demonstrated

higher levels of PM$_{2.5}$ than did nonsmoking households in buildings with smoke-free policies in place." (*Id.*) The study "attribute[d] this, in part, to smoke transfer within the building," and concluded that "the implementation of a smoke-free policy would reduce secondhand smoke in multiunit housing." (*Id.*) Thus, these two studies do, in fact, support HUD's conclusion that the Smoke Free Rule will improve indoor air quality.

More importantly, plaintiffs ignore the many studies considered by HUD that show strong evidence of secondhand smoke transfer between units in multifamily dwellings and its harmful effects on nonsmokers. For example, one study concluded that children living in multiunit homes are exposed to significantly more secondhand smoke—"at levels associated with morbidity"—than children living in detached homes, and suggests that smoking bans in multiunit housing can reduce this exposure.[16] (AR 2460.) That study also reviewed the negative health effects caused by *any* level of exposure to secondhand smoke to children: asthma, respiratory infections, sudden infant death syndrome, metabolic syndrome, otitis media, attenuated endothelial function, learning disorders, conduct disorders, decreased lung function, and morbidity. (AR 2461.) The Surgeon General's 2006 report confirmed that "smoke exposure poses serious health risks to children and . . . the home is the major source of exposure for children," and cited studies showing "substantial reductions in the secondhand smoke exposure

---

[16] Conclusions such as this do not, as plaintiffs suggest, support the proposition that the "one-size-fits-all" Smoke Free Rule is not justified in public housing communities with unattached houses and mobile homes because "[t]he smoke transfer justification is non-existent." (Pls.' Mem. at 51.) In promulgating the Rule, HUD was concerned with the effects of secondhand smoke on nonsmokers in the same unit as a smoker, not just those affected by the interunit transfer of smoke. *See* 81 Fed. Reg. 87,442 ("Increased air sealing could also have the disadvantage of increasing SHS exposure to non-smokers in the sealed units, and could increase the amount of SHS that settles on surfaces within the sealed units."); *see also* AR 2461 ("Parental smoking is the most common source of secondhand tobacco-smoke exposure for children.").

among healthy children as a result of an intervention." (AR 744–45.) The report also found that secondhand smoke exposure causes heart disease, lung cancer, and stroke in adults. 41 Fed. Reg. 87,441. Based on this, the report found that "[e]liminating smoking in indoor spaces fully protects nonsmokers from exposure to secondhand smoke," and "[s]eparating smokers from nonsmokers, cleaning the air, and ventilating buildings cannot eliminate exposures of nonsmokers to secondhand smoke." (AR 5958.)

Caselaw further supports the conclusion that the Smoke Free Rule is not arbitrary, capricious, or an abuse of discretion. The district court in *Good* addressed this issue and held that the Rule does not violate the APA. 2019 WL 6839320, at *6 ("[The Rule] is not arbitrary and capricious. Instead, it targets a serious harm to the public and is tailored to that purpose."). Other courts have also recognized the significant health risk posed by secondhand smoke. *See Helling*, 509 U.S. at 35; *Gallagher v. City of Clayton*, 699 F.3d 1013, 1019–20 (8th Cir. 2012) (city reasonably relied on Surgeon General's report in promulgating ordinance prohibiting outdoor smoking on certain public property); *Davis v. McCain*, No. 1:16-CV-01534, 2018 WL 4936566, at *4 (W.D. La. Sept. 19, 2018) ("It is well-established that second-hand smoke is dangerous."); *Telepo*, 2018 U.S. Dist. LEXIS 231893, at *2 n.3.

While plaintiffs disagree with HUD's action in promulgating the Smoke Free Rule, they have not shown that the Rule violates the APA. Accordingly, summary judgment will be granted in defendants' favor on Count Thirteen.

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion for summary judgment and deny plaintiffs' motion for summary judgment. A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date: March 2, 2020